UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| COOPER INDUSTRIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:16 CV 39 CDP |
| | ) | |
| SPECTRUM BRANDS, INC., | ) | |
| | ) | |
| Defendant/Counter Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| COOPER INDUSTRIES, LLC, et al., | ) | |
| | ) | |
| Counter Defendants. | ) | |

## MEMORANDUM AND ORDER

In 1980, the predecessor of plaintiff Cooper (McGraw Edison) sold some

property and plant sites to the predecessor of defendant Spectrum Brands, Inc.

(Toastmaster)[1] under an Asset Purchase Agreement.[2]  One of these plants is

located in Macon, Missouri.  After the sale, environmental contamination from

trichloroethylene (TCE)[3] was discovered at the Macon site and remediation began.

---

[1] Toastmaster was dismissed as a defendant pursuant to a joint stipulation filed by the parties on
September 29, 2016.  [Doc. # 39].

[2] As the parties agree that Cooper now holds all the rights and responsibilities of McGraw Edison
and Spectrum holds all the rights and responsibilities of Toastmaster under the agreement, for
ease of reference I will substitute Cooper for McGraw Edison and Spectrum for Toastmaster in
this opinion.

[3] TCE is an industrial degreaser used to clean machine parts.  Cooper manufactured small
appliances at the Macon site.

At issue in this case is who ultimately bears the cleanup costs under the terms of the agreement, which provides that Spectrum assumes certain of Cooper's liabilities, while other liabilities are excluded. Both parties have filed summary judgment motions on this issue, each arguing that the plain language of the agreement compels judgment in its favor. I conclude that the plain language supports Cooper's interpretation of the agreement. However, the result of this determination is that Cooper's breach of contract claims must be dismissed without prejudice as they are not yet ripe for review. Spectrum's breach of contract claims are also dismissed, in part with prejudice and in part without prejudice on ripeness grounds.

As for the CERCLA counterclaims brought by Spectrum, Spectrum cannot maintain its § 107 cost recovery claim as a matter of law, so summary judgment in favor of Cooper will be granted on Count V only of the amended counterclaim. The Court will rule on the pending motions *in limine* relevant to the remaining CERCLA § 113 contribution claim by separate Memorandum and Order, but factual disputes preclude entry of summary judgment on that claim. Count VI of the amended counterclaim remains set for trial beginning January 22, 2019. As the parties have now agreed that Cooper should be allowed to amend its complaint to explicitly raise its own § 113 contribution claim, that claim will also go to trial on January 22, 2019.

<u>Background Facts</u>

Under the Asset Purchase Agreement, Spectrum assumed Cooper's liability for "debts, duties, obligations, contracts, leases and civil liabilities of, or claims against, Cooper . . . arising out of or with respect to . . . the operations of the business prior to the closing." (Section 4.1 of the Asset Purchase Agreement). [Doc. #1-1 at 12-13]. However, as relevant to this case Spectrum did not assume the following "Excluded Liabilities":

> All liabilities and obligations of Cooper to the extent to which Cooper is entitled to be reimbursed, indemnified, or otherwise protected, in whole or in part, by insurance written by licensed insurance companies.

(Asset Purchase Agreement, Section 4.2(c)).[4] [Doc. #1-1 at 13-15]. The "Excluded Liabilities" also includes "all liabilities, claims, damages . . . and all expenses, including attorneys' fees" arising out of the Excluded Liabilities. (Asset Purchase Agreement, Section 4.2(m)). [Doc. #1-1 at 13-15].

With respect to indemnification, Attachment 3 to the Asset Purchase Agreement is a General Assignment Agreement which provides that Spectrum "assumes and agrees to pay, discharge and/or perform, and forever indemnify

---

[4] Although Spectrum initially argued that additional exclusions could apply, in cross-motions for summary judgment both parties argued that the only exclusions relevant to this case are the ones contained in Sections 4.2(c) and (m). However, in opposition to Cooper's motion for summary judgment Spectrum argued that Section 4.2(g) could also apply. [Doc. # 142 at 12]. Section 4.2(g) defines "Excluded Liabilities" to include "[a]ll liabilities and obligations for damages on account of injury (real or alleged) to persons or damage (real or alleged) to property arising from events or occurrences prior to the closing date resulting from the possession or use of any <u>products</u> manufactured and sold by [Cooper]." [Doc. # 1-1 at 14, emphasis added]. There is no genuine factual dispute that Cooper manufactured and sold small appliances at the Macon site, <u>not</u> TCE. Therefore, I reject Spectrum's argument that Section 4.2(g) applies in this case.

Cooper against, All Assumed Liabilities." [Doc. # 1-1 at 159]. The General Assignment Agreement provides that, "[s]ubject to the exclusion of certain 'Excluded Liabilities' as described below, specifically included in the Assumed Liabilities are . . . claims against Cooper . . . arising in, out of or with respect to . . . the operations of the Business prior to the date hereof . . . ." [Doc. # 1-1 at 159-160]. The "Excluded Liabilities" in the General Assignment Agreement are the same as the Excluded Liabilities set out in Section 4.2 of the Asset Purchase Agreement. [Doc. # 1-1 at 161-62]. Under the terms of the General Assignment Agreement, Cooper in turn "agrees to pay, discharge and/or perform, and forever indemnify Spectrum against, the Excluded Liabilities referred to in paragraphs (a), (b), and (e) through (k) of Section 4.2 of this Agreement." [Doc. # 1-1 at 159]. Under the terms of the General Assignment Agreement, then, Cooper did not agree to indemnify Spectrum against the Excluded Liabilities listed in Section 4.2(c) or Section 4.2(m) of the Asset Purchase Agreement.

Section 13.1 of the Asset Purchase Agreement provides as follows:

To the extent any indemnification is claimed under any provisions of this Agreement, the party seeking indemnification shall promptly notify the party from whom indemnification is sought of the facts and circumstances giving rise to such claim and to give such other party the opportunity to defend, compromise or settle such matter.

[Doc. # 1-1 at 36-37].

TCE was stored at the Macon site. The parties do not agree on whether TCE was released into the environment prior to the sale of the property or how it was released. Spectrum discovered TCE in soil and groundwater at the site in 1991 and reported a spill of TCE to the regulatory authorities in 1992. Spectrum sold the Macon site and the liability for the cleanup costs to third party Compton's LLC (CLLC) in 2011. CLLC "assumed all environmental obligations and agreed to perform all environmental remediation associated with the Macon site." *Spectrum Brands, Inc. v. Compton's LLC, et. al*, Cause Number 2:16 CV 30 HEA (E.D. Mo. Aug. 21, 2018). [Doc. # 93 in Cause Number 2: 16 CV 30 HEA]. Richard Compton personally guaranteed CLLC's obligations under the agreement. *Id.*

Spectrum eventually sued CLLC and Compton in a separate lawsuit filed in this Court over their assumption of the environmental liabilities. *Spectrum Brands, Inc. v. Compton's LLC, et. al*, Cause Number 2:16 CV 30 HEA. The presiding judge in that case, the Honorable Henry E. Autrey, granted summary judgment in favor of Spectrum, ruling as a matter of law that CLLC and Compton were responsible for the environmental cleanup costs at the Macon site. [Doc. # 93 in Cause Number 2: 16 CV 30 HEA]. That ruling eventually led to the entry of a Consent Judgment, which entered judgment against CLLC and Compton and in favor of Spectrum in the amount of $1.7 million dollars. [Doc. # 98 in Cause

Number 2:16 CV 30 HEA].  Judge Autrey found the following undisputed facts

relevant to the Macon site:

> Before Spectrum acquired an interest in the Macon Site, environmental
> investigation and remediation was underway, overseen by the Missouri
> Department of Natural Resources (MDNR) as part of its Brownfields
> Voluntary Cleanup Program.  Prior to its sales to CLLC, Spectrum
> maintained the Macon Site in the VCP.  Defendants were aware of the
> environmental conditions on the Macon Site; as part of the 2011 Agreement,
> CLLC agreed to assume all environmental liability and perform all needed
> remediation, including continuing the investigation and remediation required
> by MDNR under the VCP.
>
> As required by the 2011 Agreement, Defendants notified MDNR shortly
> after their purchase of the Macon Site of the change in ownership and their
> intent to assume responsibility under the VCP.  Shortly thereafter, however,
> Defendants ceased the ongoing investigation required under the VCP.
> Compton testified during his deposition that it was his decision to quit
> testing the wells, a requirement under the VCP.
>
> In May and July 2014, MDNR conducted sampling within the Macon Site
> buildings and nearby residences to investigate whether the TCE
> contamination at the Macon Site might present a vapor intrusion risk.
> MDNR reported its findings to the EPA, who, in turn, installed vapor
> mitigation systems in two residences with elevated levels of TCE.  EPA then
> demanded that CLLC and Spectrum, individually or collectively, undertake
> additional vapor intrusion investigation of the facility and the surrounding
> neighborhood.  Spectrum, in turn, and pursuant to the 2011 Agreement,
> demanded CLLC complete the actions required by the EPA.

[Doc. # 93 in Cause Number 2: 16 CV 30 HEA].

Cooper was first notified of the TCE contamination at the Macon site

through a November 21, 2014 letter from the Environmental Protection Agency.

Cooper demanded defense and immunity from Spectrum under the Asset Purchase

Agreement, but Spectrum refused and denied any liability.  Cooper notified its

insurers of the environmental claims arising out of the Macon site in 2015. Two of Cooper's insurers are providing a defense to Cooper under a reservation of rights, and other insurers have not provided a coverage position. None of Cooper's insurers have either agreed to provide or denied coverage for claims related to the Macon site.

On November 20, 2015, Spectrum entered into an Administrative Settlement Agreement and Order on Consent (ASAOC) with the EPA regarding the Macon site. The 2015 ASAOC states that the settlement "constitutes an administrative settlement pursuant to which Spectrum has . . . resolved liability to the United States within the meaning of Sections 113(f)(2) and 112 (h)(4) of CERCLA[5] . . . ." The 2015 ASAOC covers work, past response costs, and future response costs associated with the remediation of the Macon site and provides that the EPA will not sue or take administrative action against Spectrum as long as it is compliance with the ASAOC. Spectrum, Cooper, and the EPA entered a second ASAOC covering the Macon site in 2017, which is substantially similar to the 2015 ASAOC.

Cooper alleges that the cost of remediating the Macon site should be covered by Spectrum, and it filed the instant complaint seeking a declaratory judgment that the contract obligates Spectrum to defend and indemnify Cooper for

---

[5] The Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*

any liability arising from the Macon site. Cooper also brings claims for breach and anticipatory breach of contract against Spectrum for Spectrum's refusal to defend and indemnify Cooper for costs already incurred, and for Spectrum's anticipated refusal to do the same for future costs that may be incurred by Cooper related to the Macon site.

Spectrum interprets the Asset Purchase Agreement to exclude its responsibility for cleanup costs at the Macon site.[6] Spectrum alleges that it is has sought defense and indemnification costs from Cooper for the Macon site but Cooper has denied liability and indemnification. Spectrum brings a counterclaim for breach of the Asset Purchase Agreement against Cooper for its refusal to provide Spectrum with a defense and indemnification for costs incurred in connection with remediation of the Macon site.[7] (Count II of the Amended Counterclaim). Spectrum also brings its own anticipatory breach of contract claim against Cooper for its anticipated refusal to indemnify and defend Spectrum for future costs associated with the Macon site. (Count III of the Amended Counterclaim). Spectrum also seeks a declaration that the costs related to the

---

[6] Although additional sites located in Kirksville, Missouri and Laurinburg, North Carolina were initially included as part of Spectrum's counterclaims, any claims relating to these two sites were dismissed pursuant to a stipulation of the parties filed on June 23, 2017. [Doc. # 88]. Spectrum also brought claims related to unspecified "other sites," but I dismissed those by Memorandum and Order dated November 28, 2016. [Doc. # 50].

[7] Spectrum also sued Cooper's insurance company, Employers Insurance Company of Wausau, but I dismissed Spectrum's amended counterclaim against Wausau by Memorandum and Order dated March 22, 2017. [Doc. # 81]. Wausau is no longer a party to this case.

Macon site are liabilities retained by Cooper and that the Asset Purchase Agreement requires Cooper to indemnify and defend Spectrum for costs related to the Macon site. (Count IV of the Amended Counterclaim). Counts V and VI seek cost recovery, contribution, and a declaratory judgment under CERCLA.

Cooper now moves for summary judgment on Counts I through III of its complaint and on Counts II through IV of the amended counterclaim, arguing that the plain language of the Asset Purchase Agreement provides that Spectrum assumed the liability for the CERCLA cleanup costs at the Macon Site and that any liability it has for such costs is limited to any recovery it obtains from insurance. Cooper contends that Spectrum's claim for cost recovery under CERCLA fails with respect to the Macon site because Spectrum has settled with the relevant government authorities with respect to these sites, which limits it to contribution damages only. Cooper also argues that Spectrum has not produced evidence of intent necessary to establish arranger liability under CERCLA.

Spectrum also moves for summary judgment on Counts I-III of Cooper's complaint and on the contract and declaratory relief claims asserted in its amended counterclaim (Counts II, III, and IV), arguing that the plain language of the Asset Purchase Agreement requires Cooper to retain the liability for all CERCLA cleanup costs at the Macon site if it is entitled to any reimbursement from its insurance companies. Spectrum argues that the Asset Purchase Agreement

requires Cooper to first demonstrate that it is not entitled to any reimbursement from insurance before Spectrum is liable for any of the cleanup costs as an assumed liability. Spectrum also argues that it is entitled to judgment on its CERCLA claim as alleged in Count V, or seeks partial declaratory relief on its alternative CERCLA claim asserted in Count VI of the amended counterclaim.

<u>Summary Judgment Standard</u>

The standard for summary judgment is well settled. In determining whether summary judgment should issue, the Court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Littrell v. City of Kansas City, Mo.*, 459 F.3d 918, 921 (8th Cir. 2006); *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in his pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 256; *Littrell*, 459 F.3d at 921. "The party opposing

summary judgment may not rest on the allegations in its pleadings; it must set forth specific facts showing that there is a genuine issue for trial." *United of Omaha Life Ins. Co. v. Honea*, 458 F.3d 788, 791 (8th Cir. 2006) (internal quotation marks and citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Hitt v. Harsco Corp.*, 356 F.3d 920, 923 (8th Cir. 2004) (internal quotation marks and citation omitted). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party" on the question. *Anderson*, 477 U.S. at 248; *Woods*, 409 F.3d at 990.

To survive a motion for summary judgment, the "nonmoving party must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor based on more than mere speculation, conjecture, or fantasy." *Putman v. Unity Health System*, 348 F.3d 732, 733–34 (8th Cir. 2003) (internal quotation marks and alterations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. 242 at 252*; Davidson & Associates v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007).

"Simply referencing the complaint, or alleging that a fact is otherwise, is insufficient to show there is a genuine issue for trial." *Kountze ex rel. Hitchcock Foundation v. Gaines*, 536 F.3d 813, 818 (8th Cir. 2008).

Discussion

The Asset Purchase Agreement is governed by New York law. (Asset Purchase Agreement, Section 13.8) [Doc. #1-1 at 36]. "In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use, and thus the court ordinarily looks only at the wording used by the drafters who presumably understood what they intended." *Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 152 (S.D.N.Y. 2007) (internal quotation marks and citation omitted). "New York law follows the familiar principle that a contract that is 'complete, clear and unambiguous on its face' will be 'enforced according to the plain meaning of its terms.'" *Hildene Opportunities Master Fund, Ltd. v. Arvest Bank*, 897 F.3d 980, 984 (8th Cir. 2018) (quoting *Cortlandt St. Recovery Corp. v. Bonderman*, 31 N.Y.3d 30, 96 N.E.3d 191, 198 (2018)). When written contract terms are clear and unambiguous, "the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations." *M & R, LLC v. SK Rockaway Real Estate Co., LLC*, 902 N.Y.S.2d 621, 622, 74 A.D.3d 759 (N.Y. App. Div. 2010). "It is well established that when

reviewing a contract, particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties manifested thereby." *Kolbe v. Tibbetts*, 22 N.Y.3d 344, 353, 980 N.Y.S.2d 903, 3 N.E.3d 1151 (2013) (internal quotation marks and brackets omitted). "A reading of the contract should not render any portion meaningless." *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324, 834 N.Y.S.2d 44, 865 N.E.2d 1210 (2007). "New York courts follow the well-established principle that, 'when a contract specifically defines a word that has various possible meanings, [the court] looks to the plain meaning of that definition.'" *Hildene*, 897 F.3d at 984–85 (quoting *Gateway Customer Sols., LLC v. GC Serv. Ltd. P'ship*, 825 F.3d 502, 506 (8th Cir. 2016) and citing *Selective Ins. Co. of Am. v. Cty. of Rensselaer*, 26 N.Y.3d 649, 47 N.E.3d 458, 461-62 (2016)).

Here, the parties (and the Court) agree that the Asset Purchase Agreement is unambiguous[8] and encompasses claims for CERCLA liability despite the fact that the agreement was entered into prior to the statute's enactment. Although the parties dispute when the TCE was released into the environment, there appears to be no dispute that any such release was related to the operations at the Macon site. Therefore, if the TCE was released prior to the sale of the property, under Section 4.1 of the Asset Purchase Agreement Spectrum would assume Cooper's liability

---

[8]For this reason, I do not consider the extrinsic evidence offered by Spectrum, consisting of purchase agreements between Cooper and third parties, to interpret the plain meaning of the phrase "in whole or in part" in the Asset Purchase Agreement.

for the cleanup costs as a "claim[] against, Cooper . . . arising out of or with respect to . . . the operations of the business prior to the closing" unless the liability for these costs is considered an "Excluded Liability" under Section 4.2 of the agreement. This is the crux of the parties' dispute – whether the CERCLA liability is a retained or an assumed liability under the "insurance provision" of Section 4.2 of the Asset Purchase Agreement.

The unambiguous language of the Asset Purchase Agreement provides that the CERCLA liability at issue here may be one retained by Cooper, but only "*to the extent to which* Cooper is entitled to be reimbursed, indemnified, or otherwise protected, in whole or in part, by insurance." (emphasis added). This highlighted phrase is one of limitation, not (as Spectrum argues) exclusion. "To the extent to which" carves out a limitation on Cooper's potential liability which is defined by, and dependent upon, Cooper's entitlement to insurance benefits.[9] Whether and to what extent the environmental liabilities for the Macon site are retained by Cooper and/or assumed by Spectrum is contingent upon Cooper's entitlement to insurance benefits. If Cooper is entitled to insurance benefits for the contamination at the Macon site, then it is responsible for those costs to the extent of its entitlement to those insurance benefits. If the CERCLA liabilities exceed those insurance

---

[9] The Court uses the shorthand phrase "insurance benefits" throughout this opinion as a substitute for the language of the Asset Purchase Agreement, which actually applies to the extent to which "Cooper is entitled to be reimbursed, indemnified, or otherwise protected, in whole or in part, by insurance . . . ."

benefits, however, then the liability for the excess is a liability assumed by Spectrum under Section 4.1 of the Asset Purchase Agreement, and under the General Assignment Agreement Spectrum would owe corresponding indemnification and defense duties to Cooper on the Assumed Liability.

The parties also offer differing interpretations of Section 4.2(c)'s phrase "entitled to," with Spectrum arguing that Cooper is already "entitled to" benefits here because it is receiving a defense in this case from its insurance carriers. Although this argument has facial appeal, it is not yet ripe because that defense is subject to reservation of rights, and there have been no findings with respect to the insurance carrier's duty to defend Cooper or any other coverage issues. While I agree that Cooper can be "entitled to" benefits before an insurance company actually pays out on a claim, the "entitled to" language of the Asset Purchase Agreement requires, at a minimum, that Cooper at least have proper grounds for seeking or claiming those insurance benefits. *See Ingalls Shipbuilding Inc. v. Director, Office of Worker's Compensation Programs, Dept. of Labor*, 519 U.S. 248, 256 (1997) (citing Black's Law Dictionary with approval). The determination of an insurer's duty to defend an insured requires, at a minimum, an examination of the underlying insurance policies, and those policies and any resulting coverage issues between Cooper and its carriers with respect to those policies are not properly before me. *See, e.g., Keystone Consolidated Industries, Inc. v. Employers*

*Ins. Co. of Wausau*, 456 F.3d 758, 762 (7th Cir. 2006) (insurer's duties determined by analyzing the terms of the policy).[10] Therefore, to the extent the parties seek declaratory relief as to whether and when Cooper may be "entitled to" insurance benefits in this case, the claims are dismissed without prejudice as they are not yet ripe for review for the same reasons discussed below.

Spectrum also argues that Section 4.2(c) requires Cooper to assume liability for the cleanup costs at the Macon site under more circumstances than simply when (or if) Cooper's insurance companies pay out on a claim. Section 4.2(c) applies to the extent to which Cooper is entitled to be "reimbursed, indemnified, or otherwise protected, in whole or in part, by insurance." Section 4.2(c) is not simply limited to the recovery of insurance proceeds through reimbursement or indemnification. Here, the phrase "otherwise protected" also operates to make Cooper (through its insurance company) responsible for its own defense costs associated with the Excluded Liability to the extent of the insurance benefits and precludes Cooper from otherwise seeking those defense costs from Spectrum under the General Assignment Agreement. If, however, Cooper is not entitled to insurance benefits, then Cooper is entitled to those costs from Spectrum under the General Assignment Agreement as the liability is Spectrum's responsibility as an Assumed Liability under Section 4.1 of the Asset Purchase Agreement. The

---

[10] The Court cites Illinois law here only because Spectrum argues that it applies to the underlying Wausau policies, but the result would be the same regardless of which state's laws apply. The Court makes no findings regarding which laws apply to Cooper's insurance policies as this issue is not properly before me.

Excluded Liabilities provision in Section 4.2(c) is designed only to give Spectrum credit for Cooper's insurance benefits, whatever they may be. In this case, those insurance benefits may include Cooper's defense costs, and it may also include all or only some of the cleanup costs at the Macon site. Whatever it may be, Section 4.2(c) provides only those benefits, and nothing more, to Spectrum. Absent such insurance benefits, liability for the cleanup costs at the Macon site is a liability assumed by Spectrum under Section 4.1 of the Asset Purchase Agreement.

This interpretation of Section 4.2 gives effect to the plain meaning of all provisions of the Asset Purchase Agreement, including the General Assignment Agreement, which is Attachment 3 to the Asset Purchase Agreement. The General Assignment Agreement specifically excludes the two "Excluded Liabilities" at issue here – Sections 4.2(c) and (m) – from Cooper's indemnification duties, further underscoring that Section 4.2(c) was only meant to ensure that Cooper's insurance, if and only to the extent available, offset liabilities that would otherwise be assumed by Spectrum. Under the terms of the General Assignment Agreement, Cooper "agrees to pay, discharge and/or perform, and forever indemnify Spectrum against, the Excluded Liabilities referred to in paragraphs (a), (b), and (e) through (k) of Section 4.2 of this Agreement." [Doc. # 1-1 at 159]. Cooper did not agree to indemnify Spectrum against the Excluded Liabilities listed in Section 4.2(c) or

Section 4.2(m) of the Asset Purchase Agreement, and such obligations cannot be written into the agreement.

Moreover, Section 4.2(m) of the Asset Purchase Agreement is not, as Spectrum argues, an indemnification provision. Instead, it is coextensive with other enumerated Excluded Liabilities and simply makes clear that liabilities arising from Excluded Liabilities are, themselves, also Excluded Liabilities. It does not grant any rights of indemnification to Spectrum in this case. Instead, it prevents Cooper from invoking the broad protection of the indemnification provisions of the General Assignment Agreement for claims arising out of Excluded Liabilities. Thus, to the extent Spectrum's breach of contract claims are based on Cooper's refusal to comply with the indemnification provisions of the General Assignment Agreement, they are denied. Cooper has no contractual indemnification obligations under the Asset Purchase Agreement with respect to the environmental liabilities at the Macon Site.

Spectrum argues that the clause "in whole or in part" operates to exclude its responsibility for any and all CERCLA liability if Cooper is entitled to any insurance benefits, even if that entitlement does not exceed the CERCLA liability. This interpretation ignores the phrase "to the extent to which" and is therefore rejected as contrary to the plain language of the agreement. *See Hildene*

*Opportunities*, 897 F.3d at 984.[11]  The phrase "in whole or in part" reinforces that Cooper's obligations are contingent upon, and coextensive with, its entitlement to insurance benefits, even if such benefits only cover a portion of the liabilities otherwise assumed by Spectrum.

When all the provisions of the Asset Purchase Agreement are read together, Sections 4.2(c) and (m) operate to give Spectrum the benefit of Cooper's insurance coverage – if, and only in the amount, available – for the liabilities at the Macon site, which Spectrum would, in the absence of such coverage, be responsible for as Assumed Liabilities under Section 4.1 of the Asset Purchase Agreement.

To summarize, the Court declares the respective rights and obligations of the parties under the Asset Purchase Agreement as follows: If Cooper is entitled to insurance benefits for the cleanup costs at the Macon site under any of Cooper's insurance policies, then Cooper is responsible for those costs under Section 4.2(c) of the Asset Purchase Agreement, but only to the extent of its entitlement to insurance benefits under the policies.  Spectrum assumed the liability for any and all cleanup costs which exceed these benefits under Section 4.1 of the Asset Purchase Agreement, and it owes Cooper, reimbursement, indemnification, and defense on these excess liabilities under the General Assignment Agreement of the

---

[11] Spectrum argues that the language "in whole or in part" should be construed against Cooper as the drafter of the agreement.  However, because the Asset Purchase Agreement was entered into by sophisticated negotiating parties, the doctrine of *contra proferentem* does not apply. *Coliseum Towers Assocs. v. Cty. of Nassau*, 2 A.D.3d 562, 565 (N.Y. App. Div. 2003).

Asset Purchase Agreement. Cooper owes no contractual indemnification obligations to Spectrum under Section 4.2(m) or the General Assignment Agreement of the Asset Purchase Agreement with respect to the environmental liabilities at the Macon Site. If Cooper is not entitled to insurance benefits for the cleanup costs at the Macon site under any of Cooper's insurance policies, or if it is determined that Cooper has no liability for the cleanup costs at the Macon site, then Spectrum bears the full responsibility for the cleanup costs as an Assumed Liability under Section 4.1 of the Asset Purchase Agreement and owes Cooper reimbursement, indemnification, and defense under the Asset Purchase Agreement's General Assignment Agreement. To the extent the parties seek declaratory relief which differs from the above, the claims are denied.

Because the nature of the liability is contingent upon Cooper's entitlement to insurance benefits, and that issue (as Cooper itself acknowledges) cannot be determined until Cooper's liability on the CERCLA counterclaim is resolved, Cooper's contract claims are not ripe for review and must be dismissed without prejudice. "The touchstone of a ripeness inquiry is whether the harm asserted has 'matured enough to warrant judicial intervention.'" *Vogel v. Foth & Van Dyke Assocs., Inc.*, 266 F.3d 838, 840 (8th Cir. 2001) (quoting *Paraquad, Inc. v. St. Louis Housing Auth.*, 259 F.3d 956, 958 (8th Cir. 2001)). "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as

anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)).

Cooper alleges that Spectrum has breached and will breach the Asset Purchase Agreement in the future by refusing to defend and/or reimburse costs and indemnify Cooper for costs relating to remediating the Macon site. But Spectrum cannot have breached its indemnification obligations under the Asset Purchase Agreement when it is not yet known whether those obligations even exist, and if so, the nature and extent of those obligations. After all, it is possible that the entirety of the liability could be an Excluded Liability and the responsibility of Cooper, depending upon the Court's ruling on the CERCLA claim and the subsequent resolution of the underlying insurance coverage issues. In such a scenario, Cooper would have no breach of contract claims against Spectrum as Spectrum would owe no duties to Cooper under the Asset Purchase Agreement. It is also possible that Spectrum could have assumed the entire liability depending upon resolution of these same issues. Because Cooper's contract claims are entirely dependent upon contingent future events that have not and may not occur, they are not ripe for review at this time and must be dismissed without prejudice.

Moreover, the underlying insurance coverage issues are not and will not be at issue in this case.[12]  Cooper will either have to reach agreement with its insurance carriers as to coverage issues after resolution of the CERCLA claim or commence litigation in the appropriate forum to obtain resolution of these issues. Cooper remains obligated under New York law to use its best efforts to secure insurance coverage, *see Brassil v. Maryland Cas. Co.*, 210 N.Y. 235, 104 N.E. 622, 624 (1914) (New York law recognizes the implied covenant of good faith and fair dealing as a "contractual obligation of universal force which underlies all written agreements"), and there is no dispute that Cooper has sought insurance coverage for the Macon site.  The issue of Cooper's insurance coverage for the Macon site will not, however, be joined in this case and should not be filed in or transferred to this Court as a related case, as the underlying coverage issues are distinct from, and unrelated to, the interpretation of the Asset Purchase Agreement. Instead, the insurance carriers' liability will be determined by the scope of their insurance agreements with Cooper.

Spectrum's breach of contract claims must also be dismissed.  To the extent Spectrum's claims are based upon Cooper's alleged failure to seek insurance coverage at the outset of this case, the claims are denied as the undisputed facts

---

[12] Because this issue is not before me, I do not consider the evidence that Spectrum has offered as to whether it believes that Cooper is entitled to coverage for the cleanup costs, including the expert testimony of Christine Sullivan.  As Sullivan's testimony is not relevant to any issue in this case, the motion to exclude her testimony is granted in its entirety.

demonstrate that Cooper has, in fact, sought insurance coverage for the Macon site and is being defended in this action by its insurers subject to a reservation of rights.

Spectrum also alleges that Cooper has breached, and will breach, the Asset Purchase Agreement by "refusing to defend and/or indemnify" Spectrum for costs related to the Macon site. Summary judgment in favor of Cooper will be granted on the breach of contract claims to the extent they are based on contractual indemnity as Spectrum is not entitled to contractual indemnity in this case as a matter of law. As explained above, under the General Assignment Agreement Cooper's indemnification duties do not include the Excluded Liabilities under either Section 4.2(c) or (m) of the Asset Purchase Agreement, which are the only possible Excluded Liabilities at issue in this case. As Cooper cannot breach an indemnification obligation where none is owed, Spectrum's breach of contract claims based on indemnification fail as a matter of law.[13]

As for the Spectrum's claim that Cooper breached the Asset Purchase Agreement by failing to retain the Macon site as a Retained Liability, that claim must be dismissed without prejudice on ripeness grounds for the same reasons that Cooper's claims must be dismissed. Because the nature of the liability is

---

[13] Spectrum's argument in opposition to summary judgment that it is also seeking implied indemnification fails, as Spectrum has pleaded only claims based upon breach of the Asset Purchase Agreement, not quasi-contractual claims for implied indemnification. The Court makes no comment on whether Spectrum may be able to assert a claim for implied indemnification against Cooper in the face of a valid and enforceable written contract which expressly provides for indemnification or otherwise seek these costs as damages in a breach of contract claim once such a claim ripens, as the Court does not issue advisory opinions.

dependent upon Cooper's entitlement to insurance benefits, and that issue cannot be fully determined until Cooper's liability on the CERCLA counterclaim is resolved, Spectrum's claim is not ripe for review and must be dismissed without prejudice. *See Texas*, 523 U.S. at 300. As with Cooper's contract claims, Spectrum's contract claim depends entirely on contingent future events that may or may not occur and is therefore not ripe for review at this time.[14]

Turning now to Spectrum's CERCLA counterclaims, Spectrum has brought a claim for cost recovery under § 107(a) of CERCLA (Count V) and an alternative claim for contribution under §113(f) of CERCLA (Count VI). Cooper argues that Spectrum is limited to pursing a claim for contribution under §113(f) because it has entered into administrative settlements for the claims at issue. The Court agrees. The Eighth Circuit Court of Appeals resolved this issue as follows in *Morrison Enterprises, LLC v. Dravo Corp.*, 638 F.3d 594, 602–04 (8th Cir. 2011):

> "Two provisions of [CERCLA]—§§ 107(a) and 113(f)—allow private parties to recover expenses associated with cleaning up contaminated sites." *United States v. Atl. Research Corp.*, 551 U.S. 128, 131, 127 S. Ct. 2331, 168 L.Ed.2d 28 (2007). Though complementary, "§§ 107(a) and 113(f) provide two 'clearly distinct' remedies," *id.* at 138, 127 S. Ct. 2331, "to persons in different procedural circumstances," *id.* at 139, 127 S. Ct. 2331 (quotation omitted). Section 107(a)(4)(B) permits a private party who has voluntarily incurred costs cleaning up a site for which it may be held liable to recover necessary response costs from another liable party through a direct recovery action. *See id.* at 133–34, 127 S. Ct. 2331, aff'g *Atl. Research Corp. v. United States*, 459 F.3d 827 (8th Cir. 2006).

---

[14] To the extent Spectrum's amended counterclaim can be read to include allegations that Cooper failed to use its best efforts to ultimately obtain insurance coverage for the cleanup costs at the Macon site, that breach of contract claim is also dismissed without prejudice on ripeness grounds.

Section 113(f), enacted after § 107 as part of the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub.L. No. 99–499, 100 Stat. 1613 (1986), "authorizes one [potentially responsible party] to sue another for contribution in certain circumstances." *Id.* at 132, 127 S. Ct. 2331. Section 113(f)(1) allows a person to seek contribution from any other person who is liable or potentially liable under § 107(a) during or following a civil action under §§ 106 or 107. Section 113(f)(3)(B) authorizes "[a] person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement" to seek contribution from any person who has not so resolved its liability.

The term "contribution" has its traditional meaning of a "tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault." *Atl. Research*, 551 U.S. at 138, 127 S. Ct. 2331 (quoting Black's Law Dictionary 353 (8th ed.2004)). The "right to contribution under § 113(f)(1) is contingent upon an inequitable distribution of common liability among liable parties." *Id.* at 139, 127 S. Ct. 2331.

The right to contribution under § 113(f) is more limited than the right to recover costs under § 107(a). *See Atl. Research*, 459 F.3d at 832. A person seeking contribution under § 113(f) may be subject to the equitable allocation of response costs, *see* § 113(f)(1), and may not recover from previously settling parties, *see* § 113(f)(2). Such claims are also subordinate to the rights of the United States or a State, *see* § 113(f)(3)(C), and subject to a shorter limitation period than cost-recovery claims, see § 113(g)(2)-(3).

To ensure the continued vitality of the precise and limited right to contribution Congress set forth in § 113, we have held the right to bring a cost-recovery action under § 107 "is available to parties who have incurred necessary costs of response, but have neither been sued nor settled their liability under §§ 106 or 107." *Atl. Research*, 459 F.3d at 835. "[L]iable parties which have been subject to §§ 106 or 107 enforcement actions are still required to use § 113." *Id.* at 836–37. *See also*, *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 128 (2d Cir. 2010) (holding that allowing a liable party whose claims fit § 113(f) "to proceed under § 107(a) would in effect nullify the SARA amendment and abrogate

the requirements Congress placed on contribution claims under § 113"); *ITT Indus., Inc. v. BorgWarner, Inc.*, 506 F.3d 452, 458 (6th Cir. 2007) ("To maintain the vitality of § 113(f), however, [potentially responsible parties] who have been subject to a civil action pursuant to §§ 106 or 107 or who have entered into a judicially or administratively approved settlement must seek contribution under § 113(f).").

In affirming our decision in *Atlantic Research*, the Supreme Court noted the potential for overlap between §§ 107(a) and 113(f), but declined to decide whether a liable party sustaining expenses pursuant to a consent decree following a suit under §§ 106 or 107(a) could recover such compelled costs under § 107(a), § 113(f), or both. *Atl. Research*, 551 U.S. at 139 n. 6, 127 S. Ct. 2331. **We necessarily reach that issue in these appeals, and hold that § 113(f) provides the exclusive remedy for a liable party compelled to incur response costs pursuant to an administrative or judicially approved settlement under §§ 106 or 107.** *See Atl. Research*, 459 F.3d at 830 n. 4 (explaining our holding in *Dico, Inc. v. Amoco Oil Co.*, 340 F.3d 525, 531 (8th Cir. 2003), that a liable party cannot bring an action under § 107 "remains viable for those parties which still have recourse to relief under § 113").

*Dravo Corp.*, 638 F.3d at 602–04 (emphasis supplied). Although Spectrum attempts to distinguish *Dravo Corp.* from the instant case by pointing out that it involved consent judgments rather than administrative settlements, this argument fails because the language of the statute and of the Eighth Circuit's holding apply equally to administrative settlements such as the ones at issue here.

The Sixth Circuit Court of Appeals has concluded that ASAOC agreements which recite that they are "administrative settlements" and "resolve [the parties' liability] to the United States" under § 113 for work and future response costs constitute administrative settlements as defined in § 113 and preclude cost-recovery actions under § 107. *Hobart Corp. v. Waste Management of Ohio, Inc.*,

758 F.3d 757, 768-71 (6th Cir. 2014) (citing *Dravo Corp.* with approval). The ASAOC agreements here are similar to those in *Hobart Corp.* as they also contain recitals acknowledging that they are administrative settlements within the meaning of § 113 which resolve the parties' liability to the United States. These agreements also contain covenants not to sue by the United States which took effect upon the effective dates of the agreements (November 20, 2015 and October 25, 2017). I adopt the sound reasoning of the Sixth Circuit in *Hobart Corp.* and conclude that these ASAOC agreements constitute administrative settlements which resolved Spectrum's liability to the United States with respect to the response costs at the Macon site. *See* 758 F.3d at 768-71. As such, Spectrum is limited to pursing a claim for contribution against Cooper under § 113(f). *Id.* Summary judgment will therefore be entered against Spectrum and in favor of Cooper on Spectrum's § 107(a) claim asserted in Count V of the amended counterclaim.

Spectrum's remaining CERCLA claim is one for contribution brought under § 113, 42 U.S.C. § 9613(f). Numerous disputes of material fact preclude summary judgment on this claim. To the extent Spectrum is seeking partial relief on this claim by inviting the Court to issue an advisory ruling on what factors I intend to consider, or not consider, when deciding this claim, the motion is denied.

Finally, both parties have demanded a jury trial on all claims and counterclaims in this case. [Doc. #61, #63]. The parties shall each file a

memorandum no later than **November 29, 2018** advising the Court whether they assert a right to a jury trial on Spectrum's Count VI claim for contribution brought under § 113, 42 U.S.C. § 9613, and on Cooper's Count IV claim for contribution under that same section. If either party believes a jury trial is appropriate, it should explain the legal basis for such an assertion. If the parties do not seek a jury trial on this claim, the memorandum shall so indicate and shall also advise the Court whether they consent to the bench trial of this claim in St. Louis in the Eastern Division of the Eastern District of Missouri, rather than as currently scheduled in Hannibal, Missouri. Finally, the parties shall advise the Court of the expected length of the trial.

## Conclusion

The Court again encourages the parties to use their best efforts to resolve this case, as each still faces considerable risk and expense in going forward with the trial.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion for partial summary judgment [119] is granted in part only as follows:

1) The Court declares the respective rights and obligations of the parties under the Asset Purchase Agreement on Count I of the Complaint and Count IV of the First Amended Counterclaim as follows: If Cooper is entitled to insurance

benefits for the cleanup costs at the Macon site under any of Cooper's insurance policies, then Cooper is responsible for these costs under Section 4.2(c) of the Asset Purchase Agreement, but only to the extent of its entitlement to insurance benefits under these policies. Spectrum assumed the liability for any and all cleanup costs which exceed these benefits under Section 4.1 of the Asset Purchase Agreement, and it owes Cooper reimbursement, indemnification, and defense on these excess liabilities under the General Assignment Agreement of the Asset Purchase Agreement. Cooper owes no contractual indemnification obligations to Spectrum under Section 4.2(m) or the General Assignment Agreement of the Asset Purchase Agreement with respect to the environmental liabilities at the Macon Site. If Cooper is not entitled to insurance benefits for the cleanup costs at the Macon site under any of Cooper's insurance policies, or if it is determined that Cooper has no liability for the cleanup costs at the Macon site, then Spectrum bears the full responsibility for the cleanup costs as an Assumed Liability under Section 4.1 of the Asset Purchase Agreement and owes Cooper reimbursement, indemnification, and defense under the Asset Purchase Agreement's General Assignment Agreement;

2) Plaintiff shall have summary judgment on Count V of defendant's First Amended Counterclaim, and Count V of defendant's First Amended Counterclaim is dismissed with prejudice; and

3) Counts II and III of the First Amended Counterclaim are dismissed in part with prejudice and in part without prejudice as follows: defendant's breach of contract claims which are based on allegations that Cooper breached the Asset Purchase Agreement by failing to retain the Macon site as a Retained Liability or by failing to use its best efforts to secure insurance coverage for the cleanup costs at the Macon site are dismissed without prejudice on ripeness grounds, and all other breach of contract claims asserted in Counts II and III of the First Amended Counterclaim are denied and dismissed with prejudice.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment [123] is denied in all respects, except Counts II and III of plaintiff's complaint are dismissed without prejudice on ripeness grounds.

**IT IS FURTHER ORDERED** that the motion to exclude the testimony of Christine Sullivan [133] is granted.

**IT IS FURTHER ORDERED** that plaintiff's unopposed motion to amend [156] is granted, and plaintiff's amended and supplemental complaint [156-1] is deemed filed as of this date.

**IT IS FURTHER ORDERED** that the parties shall each file a memorandum regarding jury demand and length and location of trial as set out above no later than **November 29, 2018**.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 16th day of November, 2018.