UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| COOPER INDUSTRIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:16 CV 39 CDP |
| | ) | |
| SPECTRUM BRANDS, INC., | ) | |
| | ) | |
| Defendant/Counter Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| COOPER INDUSTRIES, LLC, et al., | ) | |
| | ) | |
| Counter Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case presents competing claims for contribution and requires the Court to allocate responsibility for environmental remediation costs between two companies who are both former owners and operators of a small appliance manufacturing plant in Macon, Missouri. The plant used trichloroethylene (TCE) to degrease metal components used in appliances such as toasters and waffle irons. I conclude that plaintiff/counterdefendant Cooper Industries, LLC is responsible for 4% of the clean up costs associated with the west side of the property and under the building's footprint, and defendant/counterplaintiff Spectrum Brands, Inc., is responsible for 96% of those costs.

The predecessor of plaintiff Cooper (McGraw Edison) sold several manufacturing plants to the predecessor of defendant Spectrum (Toastmaster)[1] under an Asset Purchase Agreement in 1980. The subject of this case is the plant located in Macon, Missouri. After the sale, environmental contamination from TCE was discovered at the Macon site and remediation efforts began.

Cooper and Spectrum assert contribution claims against each other under Section 113 of the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.* (CERCLA).[2] These claims were tried to the Court during a four-day bench trial. The parties have submitted a joint stipulation of uncontested facts, post-trial briefs, proposed findings of fact, and proposed conclusions of law. After careful consideration of all relevant, admissible evidence under the appropriate standards, I determine that Cooper and Spectrum are both liable under CERCLA for the cleanup of the Macon Site, and I allocate responsibility for response costs associated with the west side of the property and

---

[1] Toastmaster was dismissed as a defendant pursuant to a joint stipulation filed by the parties on September 29, 2016. Doc. # 39.

[2] The parties also brought claims for declaratory relief and breach of contract against one another, each arguing that the Asset Purchase Agreement made the other party responsible for the cleanup costs as a matter of law. As set out in my Memorandum and Order dated November 16, 2018, I declared the rights and obligations of the parties under the Asset Purchase Agreement with respect to the cleanup costs under the terms of the agreement, rejecting Spectrum's arguments that the agreement made Cooper solely responsible for these costs. Doc. 158. I dismissed the breach of contract claims. Spectrum also brought a cost recovery action against Cooper under § 107 of CERCLA, which I dismissed with prejudice in the same Memorandum and Order. The case then proceeded to trial on the remaining CERCLA contribution claims.

under the building's footprint 4% to Cooper and 96% to Spectrum, for the reasons set out below.

Spectrum also requests that I reconsider my ruling granting Cooper's motion for judgment as a matter of law regarding its responsibility for contamination on the east side of the property. That motion was made orally by Cooper at the close of Spectrum's case on the second day of trial and was granted orally after argument from both sides. The motion, argument, and my ruling appear in Volume 2 of the Trial Transcript at pages 117 through 122, Doc. 208. The motion for reconsideration will be denied, as I continue to believe that Spectrum offered no evidence that the contamination on the east side of the property occurred before Cooper sold the property. Therefore, Spectrum is allocated 100% of the response costs associated with the east side of the property.

### Findings of Fact

<u>Ownership and Operations at the Macon Site</u>

McGraw-Edison Company, through its Portable Appliance and Tool Group, manufactured small appliances at a plant located at 704 South Missouri Street, Macon, Missouri (hereinafter "Macon Site" or "Site") from approximately 1956 until approximately July 16, 1980. Annotated Joint Stipulation of Uncontested Facts ¶ 1, Doc. 214 (hereafter "Stipulation"). McGraw-Edison sold the Portable Appliance and Tool Group, including the Macon Site, via a July 16, 1980 Asset

Purchase Agreement ("1980 APA") with Toastmaster Holding Company and Toastmaster Inc. (collectively "Toastmaster"). Stipulation ¶ 2, Doc. 214; 1980 APA (Deft.-A-21). Toastmaster was formed by senior managers of the Portable Appliance and Tool Group for purposes of this acquisition. Stipulation ¶ 3, Doc. 214. Cooper is the legal successor to McGraw-Edison. Stipulation ¶ 4, Doc. 214. Spectrum is the legal successor to Toastmaster. Stipulation ¶ 5, Doc. 214.[3]

Spectrum owned and/or operated the Macon Site from approximately July 16, 1980 through June of 2012. Stipulation ¶ 6, Doc. 214. Spectrum manufactured small appliances at the Macon Site from approximately July 16, 1980 until 2001. Stipulation ¶ 6, Doc. 214. Spectrum thereafter used the Macon Site for distribution and repair until 2012. Stipulation ¶ 6, Doc. 214. The Macon Site consists of approximately fifteen acres and is located in an area that is primarily light industrial or residential. Stipulation ¶ 7, Doc. 214. Structures at the Macon Site include an approximately 175,000 square-foot building and a metal canopy and shed adjacent to the west side of the building. Stipulation ¶ 8, Doc. 214.

TCE Use and Contamination at the Macon Site

Both Cooper and Spectrum used TCE for small appliance manufacturing operations at the Macon Site. Stipulation ¶ 9, Doc. 214. [4] TCE was used at the

_____

[3] Cooper and McGraw-Edison are collectively referred to hereinafter as "Cooper." Spectrum and Toastmaster are collectively referred to hereinafter as "Spectrum."

[4] Production volumes were higher during the period that Spectrum operated the Macon Site than during the period that Cooper operated the Macon Site. History of the Macon Operation from 1956 - 1989 (Pltf-165 at 3-4) ("We have gone from 156 people in 1956 to over 825 employees in

- 4 -

Macon Site from at least 1971 to 2001. Trial Tr. Vol. 1 at 100:17-21 (Waller Cross), Doc. 207; Halterman Tr. 52:20-53:2, 57:25-58:3, Doc. 196-1. TCE is a non-flammable liquid chlorinated hydrocarbon used as an industrial solvent and degreaser. Stipulation ¶ 10, Doc. 214.

Two former Cooper and Spectrum employees who worked at the Macon Site testified live at trial. The first was Michael Waller, who worked at the Macon Site (first for Cooper then for Spectrum) from February 2, 1971 until 2008. Stipulation ¶ 82, Doc. 214; Trial Tr. Vol. 1 at 42:10-25 (Waller Direct), Doc. 207; Trial Tr. Vol. 1 at 91:22-92:1 (Waller Cross), Doc. 207. Mr. Waller held the title of Maintenance Foreman from 1976 until 1986. Stipulation ¶ 83, Doc. 214; Trial Tr. Vol. 1 at 45:6-8 (Waller Direct), Doc. 207. The second former Cooper/Spectrum employee who testified was Larry Clark, who worked first as the Group Safety Coordinator for Cooper from 1976 through 1980. Stipulation ¶ 86, Doc. 214; Trial Tr. Vol. 1 at 109:6-22, 113:19-21 (Clark Direct), Doc. 207. As environmental laws were enacted, he also assumed responsibility to oversee environmental compliance at Cooper's various Portable Appliance and Tool Group facilities. Stipulation ¶

---

this 33-year span; and have also increased production from 1000 units per day to over 18,000 units per day during this same time frame."); Memorandum from the Missouri Department of Natural Resources ("MDNR") to Toastmaster-Macon Superfund Technical File (May 7, 1996) at 1 (Pltf-38 at 1; Pltf-165 at 1) ("Current production is about 25,000 units a day. Between 600 and 1,000 workers are employed at the facility, depending on the phase of production. On the day of our site visit, there were 720 people employed."); Halterman Tr. 32:18-33:5, Doc. 196-1 (stating that between 1980 to 2000, the Macon Site went from employing about 450 employees to over 1,100); Toastmaster Is Macon's Largest Industrial Employer, Macon Chron.-Herald, Nov. 17, 1988 (Pltf-16 at 1) (stating that there were 150 employees in 1956, which had grown to 680 employees by 1988, working in three shifts around the clock).

86, Doc. 214. Mr. Clark continued in this role from 1980 through 2006 for Spectrum. Stipulation ¶ 86, Doc. 214. Mr. Clark was based in Columbia, Missouri, and was responsible for facilities in in eight different locations in Missouri, Iowa, and North Carolina. Trial Tr. Vol. 1 at 112:23-113:12, 116:24-25 (Clark Direct). He was therefore spread out all over and was not at the Macon Site every day. Trial Tr. Vol. 1 at 194:24-195:8 (Clark Cross), Doc. 207.

Portions of David Halterman's deposition testimony were also read into the record by agreement of the parties as Mr. Halterman was unable to appear at trial. Mr. Halterman worked at the Macon Site for both Cooper and Spectrum from 1977 until 2009. Halterman Tr. 16:16-23, 27:5-20, 29:16-19, 30:14-15, Doc. 196-1. He was Assistant Plant Manager at the Site in 1977, became Operations Manager in 1980, and was later Vice President of Operations until 2000. Halterman Tr. at 16:21-23, 17:8-13, 27:5-8, Doc. 196-1. During his tenure, the Macon Site produced toaster ovens and toasters. Halterman Tr. at 36:1-4, Doc. 196-1. To make them, the raw materials would be processed into the various component parts, assembled on a production line, and then the parts were cleaned with TCE. Halterman Tr. at 36:16-37:4, 52:20-53:16, 27:5-8, Doc. 196-1. Eventually, vanishing oil was also used to clean parts, but it never completely replaced TCE. Halterman Tr. at 54:1-23, Doc. 196-1. Parts were sometimes cleaned with TCE using a batch degreaser and a monorail degreaser. Halterman Tr. at 56:1-57:14,

57:25-58:3, Doc. 196-1. The batch degreaser had heating coils, and large baskets

of parts would be lowered into the degreaser where the TCE vapor would dissipate

the oil on the parts. Halterman Tr. at 58:4-10, Doc. 196-1. The basket was then

left over the batch degreaser to allow the parts to dry before they were removed.

Halterman Tr. at 108:25-109:6, Doc. 196-1. The monorail degreaser was a

conveyor which moved larger parts through a degreaser, where they would be

treated with TCE and come out clean. Halterman Tr. at 60:20-61:3, Doc. 196-1.

The parts were semi-dry when they emerged, and Mr. Halterman did not recall any

TCE dripping off the parts onto the floor. Halterman Tr. at 105:21-106:1, Doc.

196-1. As with the batch degreaser, the parts were left on the conveyor to allow

them to fully dry before they were removed. Halterman Tr. at 109:9-12, Doc. 196-

1. Mr. Halterman never witnessed any TCE spilling onto the floor. Halterman Tr.

at 105:24-106:11, Doc. 196-1. He believed that maintenance and tool room

people may have, at one time, cleaned their hands with TCE at the Macon Site.

Halterman Tr. at 103:8-13, Doc. 196-1.[5]

---

[5] These are the only fact witnesses who provided relevant, admissible testimony regarding
manufacturing operations at the Macon Site. Spectrum also introduced the testimony of Frances
Jenkins, another former Cooper/Spectrum employee, which Cooper moved to exclude as
inadmissible. Doc. 187. At trial, I denied Cooper's motion in limine, concluding that I would
afford the testimony such weight as I deemed appropriate. After reviewing the trial record and
Ms. Jenkins' testimony, I conclude that any relevant, admissible testimony Ms. Jenkins had to
offer was merely background evidence regarding general operations at the Macon Site and
therefore cumulative of Mr. Halterman's testimony. Moreover, it has no real probative value to
the issues before me as she admittedly did not use TCE during her tenure at the Macon Site. Ms.
Jenkins' testimony regarding spillage of TCE and liquid she observed in the parking lot at the
Macon Site is purely speculative and inadmissible. Therefore, I have not considered it in
reaching my decision. All of these witnesses retired from Spectrum some time ago. I have

Originally, new TCE was stored at the Macon Site in a 5,000-gallon aboveground storage tank ("AST") located outside, directly adjacent to the west of the facility building. Trial Tr. Vol. 1 at 48:20-49:1 (Waller Direct), Doc. 207. The AST sat on a pedestal that was within a containment area surrounded by a two-and-a-half to three-foot cement wall. Trial Tr. Vol. 1 at 53:18-21 (Waller Direct), Doc. 207. Mr. Waller testified that the floor of the containment area was originally dirt, but was changed to cement in the latter part of the 1970s. Tr. Vol. 1 at 62:24-63:13, 68:17-21 (Waller Direct), Doc. 207. However, the bottom of the pedestal or platform where the TCE AST sat was sand or gravel; there was no cement underneath the AST. Tr. Vol. 1 at 170:3-12 (Clark Cross), Doc. 207. The AST was filled with TCE by delivery tankers via hoses connected from the tanker to the AST. Trial Tr. Vol. 1 at 59:23-60:17 (Waller Direct), Doc. 207. TCE was then transferred from the AST to the batch and monorail degreasers by an above ground galvanized steel pipe. Trial Tr. Vol. 1 at 87:21-88:25 (Waller Cross), Doc. 207. Spent TCE was collected in barrels and disposed of off-site. Trial Tr. Vol. 1 at 98:10-99:14 (Waller Cross), Doc. 207; Halterman Tr. 62:7-13, Doc. 196-1.

Over the course of his thirty-seven year career at the Macon Site, Mr. Waller only witnessed one delivery of TCE to the AST at the Macon Site, which was in 1977 or 1978 when Cooper still owned the property. *See* Trial Tr. Vol. 1 at 58:10-

therefore factored the passage of time and the witnesses' ability to recall specific events into my assessment of the evidence.

13 (Waller Direct), Doc. 207.  At the end of the delivery, Mr. Waller saw two or three gallons of residual TCE drain from the delivery driver's hose onto an asphalt and concrete area.  Trial Tr. Vol. 1 at 55:15-25, 58:19-24, 62:24-63:5 (Waller Direct), 92:11-19 (Waller Cross), Doc. 207.  He testified that it evaporated "pretty quickly."  Trial Tr. Vol. 1 at 58:19-59:8 (Waller Direct), Doc. 207.[6]  Between 1976 and 1986, Mr. Waller washed his hands with TCE to remove grease.  Trial Tr. Vol. 1 at 47:17-21 (Waller Direct); Annotated Joint Stipulation of Uncontested Facts ¶ 85, Doc. 214 (PageID 11364).

Mr. Waller testified that a pinhole leak was discovered in the AST in 1983, resulting in the release of "a hundred gallons or so" of TCE.  Trial Tr. Vol. 1 at 64:13-72:22 (Waller Direct), Doc. 207.   Mr. Waller's employee smelled the TCE and reported it to Mr. Waller, who personally drained the tank and discovered the hole.  Trial Tr. Vol. 1 at 69:12-25(Waller Direct), Doc. 207.  During this process Mr. Waller determined, based on his own observations and calculations as maintenance foreman, that approximately 100 gallons of TCE had leaked into the containment area.  Trial Tr. Vol. 1 at 72:19-22 (Waller Direct), Doc. 207.  Mr.

---

[6] Mr. Waller testified that the delivery driver told him that it was "pretty normal" for TCE to spill out of the hose onto the ground after filling a storage tank.  Trial Tr. Vol. 1 56:20-57:20 (Waller direct).  This inadmissible hearsay evidence was offered by Spectrum to demonstrate that it was, in fact, normal for TCE spillage to occur during filling of the AST.  Relying on this testimony, Spectrum then argues in its post-trial brief that "every TCE delivery spanning Cooper's 24 years of operations released at least 2-3 gallons to the western parking lot where there was a seam between the asphalt and concrete surface."  Doc. 218 at 3.  This argument is not supported by any evidence, not even the inadmissible hearsay testimony of Mr. Waller, and amounts to nothing more than rank speculation.

Waller testified that Spectrum never returned the AST to service but instead started storing TCE in fifty-five gallon drums at that time.[7]  Trial Tr. Vol. 1 at 74:1-22 (Waller Direct), Doc. 207.  TCE was transferred from the fifty-five gallon drums to the degreasers by putting a valve in a drum, laying the drum on its side on a forklift, raising it up, and draining it into the degreasers.  Trial Tr. Vol. 1 at 89:2-12 (Waller Cross), Doc. 207.  Mr. Waller was certain of the 1983 date based upon corresponding personal events and I credit his testimony.  Trial Tr. Vol. 1 at 75:1-22 at 76:7 (Waller Cross), Doc. 207.  Mr. Waller's testimony is also credible given its consistency with the findings of Dr. Reynolds, discussed below.

A leak in a diesel fuel storage tank was discovered in 1991.  At that time, Mr. Clark tested the soil in the surrounding the AST's location for TCE, which indicated that TCE was present.  Trial Tr. Vol. 1 at 123:1-124:25 (Clark Direct), Doc. 207.  Mr. Clark then undertook an investigation into the source of the TCE contamination, which included hiring an outside consultant.  Trial Tr. Vol. 1 at 125:4-25 (Clark Direct), Doc. 207.  The results of the soil survey performed by the

---

[7] There was confusion at trial (among witnesses and counsel) about whether the TCE AST was removed in 1983 (as Mr. Waller testified) when the pinhole leak was discovered, or whether it was removed later in 1991 (as Mr. Clark testified).  Some of this confusion may stem from the 1991 discovery of a leak in an above ground diesel fuel storage tank which was located in the same general area.  Mr. Clark had no personal recollection of the date the TCE AST was removed.  Although counsel attempted to refresh his recollection that the date was actually 1991 by showing him a "Memorandum to File" written by him and dated February 28, 1996 (Pl. Ex. 33), Mr. Clark could only state that he believed what he wrote in the document to be true, not that he actually recalled the date as 1991.  Trial Tr. Vol. 1 at 120:7-121:5 (Clark Direct), Doc. 207.  Whether the TCE AST was actually removed in 1983 or 1991 is not material to the outcome of this case.  Whenever the tank was removed, I credit Mr. Waller's testimony that the AST was never used to store TCE after the pinhole leak was discovered in 1983.

consultant indicated elevated levels of TCE (Pltf-20 at 4-6). Mr. Clark then reached conclusions based upon the sources of the TCE contamination, which he later reported to the Missouri Department of Natural Resources (MDNR). Trial Tr. Vol. 1 at 131:6-13 (Clark Direct), Doc. 207. Mr. Clark concluded that one of the sources of contamination was TCE spillage occurring during filling of the AST. Trial Tr. Vol. 1 at 129:2-7 (Clark Direct), Doc. 207.

I do not credit Mr. Clark's conclusion with respect to the source of the TCE contamination because it is based upon inadmissible hearsay relating to TCE spills during deliveries at other plants.[8] Mr. Clark's conclusions about the source of the TCE contamination were not based upon his observations at the Macon Site. Instead, they were based upon conversations he had with an employee of the Boonville plant and an employee of the Kirksville plant about TCE spills occurring at those plants. Trial Tr. Vol. 1 at 129:15-130:11 (Clark Direct), Doc. 207. Mr. Clark was unable to recall any conversations with Macon employees regarding TCE spills during deliveries. Trial Tr. Vol. 1 at 184:18-185:4, 187:2-18 (Clark Cross), Doc. 207. Mr. Clark never observed a TCE delivery to the AST. Trial Tr. Vol. 1 at 187:2-4 (Clark Cross), Doc. 207. Mr. Clark was not involved in the

---

[8] For this reason, I do not consider Mr. Clark's conclusions as admissible evidence regarding the source of the TCE contamination, whether they appear in documents authored by Mr. Clark or incorporated into later documents drafted by the MDNR or other regulatory authorities. To the extent any MDNR or other regulatory or consultants' reports contain opinions or reach conclusions regarding the source of TCE contamination which are based upon Mr. Clark's report regarding the same, I do not consider them, either, for the same reason.

purchasing or delivery of TCE.  Trial Tr. Vol. 1 at 188:1-19 (Clark Cross), Doc. 207.

The only TCE spill Mr. Clark ever witnessed was a leak coming from a 55 gallon drum of TCE, which was located in the back of a truck parked on the east side parking lot of the Macon Site.  Trial Tr. Vol. 1 at 137:16-138:22 (Clark Direct), 191:9-192:2 (Clark Cross), Doc. 207.  This drum leak on the east side of the Macon Site occurred after 1991, when Spectrum owned the property.  Trial Tr. Vol. 1 at 191:9-192:2 (Clark Cross), Doc. 207.  This was the sole evidence offered by Spectrum with respect to the source of TCE contamination on the east side of the Macon Site.

The only admissible evidence of TCE contamination resulting from spills during deliveries to the AST comes from Mr. Waller, who testified to a sole spillage of two or three gallons in 1977-78 when Cooper owned the property. Spectrum has offered no credible, admissible evidence that any additional TCE leaks occurred during the filling of the AST.  The only credible, admissible evidence submitted at trial demonstrates that virtually all TCE contamination on the west side of the Macon Site was caused not by spillage during the filling of the AST, but by the pinhole leak in the AST in 1983 when Spectrum owned the property.

<u>Discovery of TCE in Soil and Groundwater at the Macon Site and Site Investigation</u>

Spectrum discovered TCE in soil at the Macon Site in 1991; it discovered TCE in groundwater in 1992.  Stipulation ¶ 13, Doc. 214.  Spectrum did not report the contamination to any governmental authority in 1991, but instead waited until after it had obtained the results of the groundwater survey in 1992.  As Spectrum had purchased the property from Cooper, it knew that Cooper was the prior owner and operator of the Macon Site.  Trial Tr. Vol. 1 at 194:4-23 (Clark Cross), Doc. 207; Trial Tr. Vol. 2 at 79:10-13 (Hutter[9] Cross), Doc. 208.  Despite this knowledge, Spectrum provided no notice to Cooper regarding the contamination at that time.  Trial Tr. Vol. 2 at 79:6-19 (Hutter Cross), Doc. 208.

An April 14, 1992 Phase II Environmental Site Assessment completed by consultant Groundwater Technology, Inc. found TCE in all groundwater samples tested, with the highest concentration being 160,000 µg/l.  Groundwater Technology, Inc., Phase II Environmental Site Assessment (Apr. 14, 1992) § 3.2.2 (Pltf-21 at 22).  TCE was also detected in twelve of fourteen soil samples. Groundwater Technology, Inc., Phase II Environmental Site Assessment (Apr. 14, 1992) § 3.2.1.1 (Pltf-21 at 17).

On June 17, 1992, Spectrum reported a spill of TCE at the Macon Site to the U.S. Coast Guard's National Response Center.  MDNR, Envtl. Emergency Response Report (June 17, 1002) (Pltf-22).  This report indicated that Spectrum

---

[9] Daniel Hutter is Spectrum's Chief Sustainability Officer.  Trial Tr. Vol. 2 at 40:1-3, Doc. 208.

had performed a site assessment and discovered off-site contamination of TCE in groundwater.  (Pltf-22 at 2); Stipulation ¶ 14, Doc. 214.  Mr. Clark, who reported the contamination on behalf of Spectrum, claimed that the contamination was the result of historical leaks of TCE at the AST.  MDNR, Envtl. Emergency Response Report (June 17, 1002) (Pltf-22 at 2); Stipulation ¶ 14, Doc. 214.[10]  Mr. Clark was unable to explain why he did not report the TCE soil contamination to the National Response Center in 1991 when it was discovered.  Trial Tr. Vol. 1 at 196:17-23 (Clark Cross), Doc. 207.  Despite reporting the contamination to regulatory authorities in 1992, Spectrum still provided no notice to Cooper about contamination at the Macon Site.  Trial Tr. Vol. 2 at 79:25-80:4 (Hutter Cross), Doc. 208.

In 1996, MDNR, acting under a cooperative agreement with the U.S. Environmental Protection Agency ("EPA"), conducted an integrated preliminary assessment/site investigation ("PA/SI") at the Macon Site.  Stipulation ¶ 18, Doc. 214; MDNR, Integrated PA/SI Report (Aug. 30, 1996) § 1 (Pltf-46 at 2).  The purpose of the PA/SI investigation "was to collect sufficient information concerning conditions at the site to assess the threat posed to human health and the environment, and to determine the need for additional investigation under CERCLA or other authority."  Stipulation ¶ 19, Doc. 214 (quoting MDNR, Integrated PA/SI Report (Aug. 30, 1996) § 1 (Pltf-46 at 2)).  The scope of the

---

[10] As explained above, I do not credit Mr. Clark's conclusion.

PA/SI investigation included reviewing file information, sampling environmental media, and collecting nonsampling information. Stipulation ¶ 20, Doc. 214; MDNR, Integrated PA/SI Report (Aug. 30, 1996) § 1 (Pltf-46 at 2). Investigation included Macon Site visits by MDNR personnel on April 10, 1996 and May 6, 1996, and a sampling event on May 24, 1996. Stipulation ¶ 20, Doc. 214; MDNR, Integrated PA/SI Report (Aug. 30, 1996) § 1 (Pltf-46 at 2).[11]

During the May 24, 1996 sampling event, MDNR detected TCE in the indoor air in three nearby homes, the highest concentration of which was "borderline for posing a long-term human health risk." MDNR, Integrated PA/SI Report (Aug. 30, 1996) § 7 (Pltf-46 at 22). Therefore, Spectrum knew of vapor intrusion issues in off-site homes in 1996. Trial Tr. Vol. 1 at 190:6-18 (Clark Cross), Doc. 207; Spectrum's Answer to Cooper's Interrog. No. 13 (Pltf-124 at 12-13). The PA/SI concluded that:

> Based on the results of groundwater and indoor air sampling, there are significant health concerns at the Toastmaster-Macon site, which warrant further action. Toastmaster, Inc. is currently addressing those concerns with state oversight through the [MDNR Hazardous Substances Environmental Remediation Program (HSER)] Program. If Toastmaster, Inc. fails to

---

[11] This report, like many subsequent reports and documents either generated by or for MDNR or other regulatory authorities, contains statements regarding the possible source of TCE contamination as being from spillage during AST filling. (Pltf-46 at 21); (Pltf-38 1-2); (Pltf-48 at 2). These statements are all inadmissible hearsay as to the possible source of TCE contamination. Mr. Clark was the source of this information, and as I have previously discussed his conclusions regarding the potential source of TCE contamination are speculative and unreliable. The recitation and repetition of Mr. Clark's inadmissible statements in an MDNR document do not turn Mr. Clark's unsupported and untrustworthy conclusions into admissible evidence.

address this site under the HSER program, DNR will refer the site to EPA for further action under CERCLA authority.

Stipulation ¶ 21, Doc. 214 (quoting MDNR, Integrated PA/SI Report (Aug. 30, 1996) § 7 (Pltf-46 at 22)).

Participation in the Missouri Voluntary Cleanup Program and Sale to Compton's, LLC

In 1996, Spectrum enrolled the Macon Site into the MDNR's Brownfields Voluntary Cleanup Program ("VCP"). Stipulation ¶ 16, Doc. 214; Letter from MDNR to Spectrum (Mar. 29, 1996) (Pltf-36). Spectrum did not provide notice to Cooper of the contamination at the Macon Site at the time Spectrum enrolled the Site in the VCP. Trial Tr. Vol. 2 at 79:20-24 (Hutter Cross), Doc. 208.

During the period when the Macon Site was enrolled in the VCP, periodic site monitoring was conducted. Stipulation ¶ 17, Doc. 214; Spectrum's Answer to Cooper's Interrog. No. 12 (Pltf-124 at 11-12).

MDNR repeatedly asked Spectrum to prepare a remedial action plan for the Macon Site as part of its participation in the VCP. Letter from MDNR to Toastmaster (Jan. 2, 2001) at 5 (Pltf-50 at 5); Letter from MDNR to Environmental Resources Management (Apr. 6, 2010) at 2 (Pltf-62 at 2); Letter from MDNR to Environmental Resources Management (Feb. 3, 2011) at 1 (Pltf-63 at 1); Trial Tr. Vol. 2 at 68:12-69:7, 95:1-14 (Hutter Cross), Doc. 208. Spectrum never prepared a remedial action plan and did not remediate the Macon Site during its participation

in the VCP. Spectrum's Answer to Cooper's Interrog. No. 12, (Pltf-124 at 11-12) ("Participation in the Missouri BVCP Program has not involved cleanup, response, or remediation.").

Contamination at the Macon Site spread during the period that Spectrum was enrolled in the VCP without performing remediation work. Trial Tr. Vol. 2 at 21:12-16-22:2-11 (Gass[12] Cross), Doc. 208; Trial Tr. Vol. 3 at 150:23-151:20 (Gass Cross), Doc. 209; Letter from MDNR to Environmental Resources Management (Apr. 6, 2010) at 2 (Pltf-62 at 2) (stating "that the deep groundwater plume appears to be expanding").

In September 2011, Spectrum and Compton's, LLC ("CLLC") executed a Property Transfer Agreement (with Assignment and Assumption of Environmental Liabilities) (Pltf-64). Stipulation ¶ 23, Doc. 214. In May 2012, Spectrum and CLLC executed the First Amendment to Property Transfer Agreement (Pltf-66). Stipulation ¶ 24, Doc. 214. The Property Transfer Agreement (with Assignment and Assumption of Environmental Liabilities) and First Amendment to Property Transfer Agreement are collectively referred to herein as the "PTA." Under the PTA, Spectrum sold CLLC the Macon Site for $150,000, and CLLC agreed to assume all environmental obligations and perform all environmental remediation associated with the Macon Site. Stipulation of ¶ 25, Doc. 214; Property Transfer Agreement (with Assignment and Assumption of Environmental Liabilities) §§

---

[12] Tyler Gass is Spectrum's expert witness. His testimony will be discussed below.

7.3, 9 (Pltf-64 at 6-8); First Amendment to Property Transfer Agreement ¶ 2 (Pltf-66 at 1).

Richard Compton personally guaranteed CLLC's obligations under the PTA (Pltf-65). Stipulation ¶ 26, Doc. 214. Spectrum transferred the deed of the Macon Site to CLLC in June of 2012. Stipulation ¶ 27, Doc. 214; Special Warranty Deed (Pltf-67). CLLC and Mr. Compton are referred to collectively as CLLC.

CLLC notified MDNR in March 2012 that it had purchased the Macon Site and would assume responsibility for continuing to investigate and remediate the Site through the VCP. Stipulation ¶ 28, Doc. 214; Letter from MDNR to Spectrum (June 15, 2012) (Pltf-69) (describing correspondence from CLLC). CLLC's role as participant in the VCP for the Macon Site was memorialized in an Environmental Remediation Oversight Letter of Agreement between CLLC and MDNR executed in May 2012. Stipulation ¶ 29, Doc. 214; Letter from MDNR to Spectrum (June 15, 2012) (Pltf-69) (confirming CLLC as the new VCP participant for the Macon Site and terminating Spectrum's role in the program). Subsequently, CLLC did not continue to investigate and remediate the Macon Site in a manner satisfactory to MDNR. Stipulation ¶ 30, Doc. 214; Letter from MDNR to CLLC (Jan. 15, 2014) (Pltf-70). The Macon Site was removed from the VCP by MDNR on January 15, 2014. Stipulation ¶ 31, Doc. 214; Letter from MDNR to CLLC (Jan. 15, 2014) (Pltf-70).

Referral of the Macon Site to the EPA

MDNR conducted indoor air sampling in the building at the Macon Site in May 2014. Letter from the Missouri Department of Health and Senior Services ("MDHSS") to MDNR (June 26, 2014) at 1 (Pltf-71 at 1). MDHSS reviewed the results of the sampling and concluded that "TCE[] in indoor air currently poses a health risk to individuals working in the building (i.e., an urgent public health hazard)." (Pltf-71 at 1). On June 27, 2014, MDNR notified EPA that it had conducted air sampling in and around the Macon Site and that, due to the detected levels of TCE, MDNR was referring the Site to EPA for further action. Stipulation ¶ 32, Doc. 214; Letter from MDNR to EPA (June 27, 2014) (Pltf-72). As of July 2014, the TCE screening levels for indoor air for EPA and MDNR were 2 µg/m3 for residential structures and 8.8 µg/m3 for commercial structures. Stipulation ¶ 34, Doc. 214; Letter from MDHSS to MDNR (June 26, 2014) at 8 (Pltf-71 at 8).

In September 2014, EPA contacted CLLC and Spectrum and advised that EPA desired continued investigation of whether TCE vapor intrusion was impacting the facility and the neighborhood and requested that they take action at the Macon Site and enter into an administrative settlement agreement and order on consent to investigate TCE vapor intrusion at the Macon Site and nearby homes. Stipulation ¶ 35, Doc. 214; Email from Spectrum to CLLC (Sept. 10, 2014) (Pltf-73 at 1); Email from Spectrum to CLLC (Oct. 6, 2014) (Pltf-74 at 7); Email from

EPA to Spectrum and CLLC (Oct. 29, 2014) (Pltf-74 at 8). Spectrum emailed

CLLC's attorney, Richard Winkie, on September 10, 2014 regarding EPA's

request and sought to have CLLC perform. Stipulation ¶ 36, Doc. 214; Spectrum

Email (Sept. 10, 2014) (Pltf-73 at 1).

On September 16, 2014, Spectrum provided to EPA a Macon Site history

that detailed past ownership and operations, including the Cooper period of

operations. Stipulation ¶ 37, Doc. 214; Letter from Spectrum to EPA (Sept. 16,

2014) (Pltf-75). It was only at this point that Spectrum sought to involve Cooper at

the Macon Site. Trial Tr. Vol. 2 at 50:22-51:20 (Hutter Direct), Doc. 208.

On October 2, 2014, EPA installed vapor intrusion mitigation systems in

two residences with elevated levels of TCE, located at 406 and 504 Kohl Street.

Stipulation ¶ 38, Doc. 214; Administrative Settlement Agreement and Order on

Consent to Investigate Vapor Intrusion ("VI ASAOC") ¶ 30 (Pltf-84 at 8-9);

Arcadis, Engineering Evaluation/Cost Analysis Report ("EE/CA Report") (Sept. 7,

2018) § 3.4.1 (Pltf-141 at 17).

EPA's Notice to Cooper and Subsequent Correspondence Between Cooper and
Spectrum Regarding the Macon Site

On November 21, 2014, EPA sent a Request for Information pursuant to

Section 104(e) of CERCLA to Eaton Corporation, a separate subsidiary of

Cooper's now ultimate parent company. Stipulation ¶ 39, Doc. 214; Letter from

EPA to Eaton Corporation (Nov. 21, 2014) (Pltf-76). This was the first written

notice Cooper received about contamination at the Macon Site. Trial Tr. Vol. 2 at 208:6-9 (Allen[13] Direct), Doc. 208.

On December 12, 2014, Cooper sent a letter to Spectrum, demanding defense and indemnity under the 1980 APA for liabilities arising from the Macon Site. Stipulation ¶ 40, Doc. 214; Letter from Cooper to Spectrum (Dec. 12, 2014) (Pltf-78); Trial Tr. Vol. 2 at 209:25-210:11 (Allen Direct), Doc. 208. Eaton Corporation responded to EPA's November 21, 2014 Request for Information by letter dated December 16, 2014, attaching the 1980 APA. Stipulation ¶ 41, Doc. 214; Letter from Eaton Corporation to EPA (Dec. 16, 2014) (Pltf-79). Eaton Corporation explained that Cooper was the successor to McGraw-Edison. Trial Tr. Vol. 2 at 208:13-209:24 (Allen Direct). Doc. 208; Letter from Eaton Corporation to EPA (Dec. 16, 2014) (Pltf-79 at 2).

On January 12, 2015, Spectrum sent Cooper a letter stating that Spectrum did not assume any liability related to the Macon Site under the 1980 APA. Stipulation ¶ 42, Doc. 214; Letter from Spectrum to Cooper (Jan. 12, 2015) (Pltf-80). This letter was the first time Spectrum contacted Cooper regarding contamination at the Macon Site. Trial Tr. Vol. 2 at 211:24-212:6 (Allen Direct), Doc. 208; Trial Tr. Vol. 2 at 78:9-13 (Hutter Cross), Doc. 208 ("Mr. Hutter, isn't it true that until January of 2015, neither Spectrum nor any of its predecessors had

---

[13] Jeffrey Allen is the manager of acquisitions, integration, and remediation at Eaton Corporation. He is also now Cooper's manager for remediation of the Macon Site. Trial Tr. Vol. 2 at 107:7-108:1, Doc. 208.

ever given notice to Cooper Industries or McGraw-Edison of the contamination at the Macon facility? A. Yes.").

On February 2, 2015, EPA sent a Request for Information to Cooper pursuant to Section 104(e) of CERCLA regarding the Macon Site. Stipulation ¶ 43, Doc. 214; Letter from EPA to Cooper (Feb. 2, 2015) (Pltf-81). Cooper responded to EPA's February 2, 2015 Request for Information by letter dated February 26, 2015. Stipulation ¶ 44, Doc. 214; Letter from Cooper to EPA (Feb. 26, 2015) (Pltf-82).

On April 13, 2016, Cooper received a General Notice Letter from the EPA, dated April 5, 2016, identifying it as a Potentially Responsible Party ("PRP") for the remediation of the Macon Site pursuant to CERCLA Sections 106(a) and 107(a). Stipulation ¶ 45, Doc. 214; Letter from EPA to Cooper (Apr. 5, 2016) (Pltf-86). This was the first time that EPA notified Cooper that EPA considered Cooper a PRP for the Site. Trial Tr. Vol. 2 at 213:2-23 (Allen Direct), Doc. 208.

EPA's Administrative Orders

On November 20, 2015, EPA, Spectrum, and CLLC entered into an Administrative Settlement Agreement and Order on Consent to Investigate Vapor Intrusion ("VI ASAOC"), EPA Docket No. CERCLA-07-2015-0006, to further investigate vapor intrusion concerns pertaining to the Macon Site. Stipulation ¶ 46, Doc. 214; VI ASAOC (Pltf-84). Spectrum and CLLC entered into an

agreement entitled "Former Macon, Missouri Toastmaster Facility Environmental Work and Indemnity Agreement" on November 12, 2015 ("Environmental Work and Indemnity Agreement") (Pltf-83). Stipulation ¶ 47, Doc. 214. The Environmental Work and Indemnity Agreement referred to the fact that CLLC had assumed all environmental obligations and liabilities associated with or arising from the Macon Site under the PTA in 2011, and that CLLC was to perform all work under the VI ASAOC and indemnify Spectrum for that work. Stipulation ¶ 47, Doc. 214; Environmental Work and Indemnity Agreement §§ 1.1, 1.3, 2.1-2.5 (Pltf-83 at 1-3).

CLLC initially began to perform under the VI ASAOC, but then stopped performing. Stipulation ¶ 48, Doc. 214; Letter from EPA to CLLC and Spectrum (Feb. 2, 2016) (Pltf-85). On February 2, 2016, EPA directed Spectrum to take over investigation at the Macon Site from CLLC due to CLLC's failure to perform. Stipulation ¶ 49, Doc. 214; Letter from EPA to CLLC and Spectrum (Feb. 2, 2016) (Pltf-85). Spectrum thereafter took over the VI ASAOC pursuant to a revised vapor intrusion sampling work plan. Stipulation ¶ 49, Doc. 214; Email from Spectrum to EPA (Feb. 8, 2016) (Deft.-A-129 at Deft.-A-129-001) (stating that Spectrum is taking action to perform the work, reviewing the work plan prepared by CLLC's consultant, and determining what consulting firm Spectrum will use to

proceed). The VI ASAOC work is nearing completion. Stipulation ¶ 50, Doc. 214; VI ASAOC Monthly Progress Report (July 3, 2018) (Deft.-A-130).

By letter dated August 2, 2016, EPA sent correspondence to Cooper, Spectrum, and CLLC enclosing a draft second Administrative Settlement Agreement and Order on Consent ("ASAOC") to effectuate the additional investigation at the Macon Site that EPA desired. Stipulation ¶ 56, Doc. 214; Letter from EPA to Cooper, Spectrum, and CLLC (Aug. 2, 2016) (Pltf-91). Cooper initially responded to EPA by letter dated August 11, 2016. Stipulation ¶ 57, Doc. 214; Letter from Cooper to EPA (Aug. 11, 2016) (Pltf-92). Cooper referenced the 1980 APA and the current litigation with Spectrum, explaining that Cooper had not been presented with evidence of releases at the Macon Site during its period of operations, and that even if there were releases during its period of operations, under the terms of the 1980 APA, either Spectrum or Cooper's insurers would be responsible for paying any costs associated with the Macon Site. Letter from Cooper to EPA (Aug. 11, 2016) at 2-4 (Pltf-92 at 2-4). Spectrum initially responded to EPA by letter dated August 24, 2016. Stipulation ¶ 57, Doc. 214; Letter from Spectrum to EPA (Aug. 24, 2016) (Pltf-95). Spectrum stated that EPA should issue a Unilateral Administrative Order ("UAO") to Cooper and/or CLLC rather than pursuing Spectrum. Letter from Spectrum to EPA (Aug. 24, 2016) at 1 (Pltf-95 at 1); Trial Tr. Vol. 2 at 89:25-90:16 (Hutter Cross).

Spectrum provided to EPA by email dated September 6, 2016 (Deft.-A-132), a July 25, 2016 Report entitled, "Quantitative Assessment of the Timing of the Release of Trichloroethene at the Toastmaster Facility in Macon, Missouri" (Deft.-A-76). Stipulation ¶ 58, Doc. 214; Letter from Spectrum to EPA (Sept. 6, 2016) (Pltf-99).[14] Spectrum encouraged EPA to issue a UAO to Cooper and CLLC in a letter discussing its willingness to participate in an ASAOC to perform an Engineering Evaluation/Cost Analysis ("EE/CA"). Email from Spectrum to EPA (Nov. 1, 2016) (Pltf-104) ("In connection with EPA's contemplated issuance of P&C orders to both Compton and Cooper as part of Spectrum's willingness to perform the second ASOAC [sic] (for EE/CA-type investigation of groundwater and TCE source area), please consider the proposed revisions shown in the attached red-lines." (emphasis added)); Email from Spectrum to EPA (Apr. 21, 2017) (Pltf-109) ("Also want to confirm that EPA is committed to issuing and enforcing a Participate and Cooperate Order(s) against Cooper and Compton, following the revised language that we provided."); Trial Tr. Vol. 2 at 87:4-89:24 (Hutter Cross), Doc. 208.

EPA never responded to Cooper's August 11, 2016 letter, and Cooper first learned of EPA's plans to issue a UAO to Cooper in May of 2017 from Spectrum.

---

[14] This report was prepared by Spectrum's expert witness, Tyler Gass of Integral Consulting Inc., at the request of Spectrum's counsel "in anticipation of litigation with Cooper." (Deft.-A-76) and (Pltf.-99 at fn1). As discussed below, I do not credit Gass' conclusion with respect to the initial release date of TCE (whether contained in this or subsequent expert reports) as it relies on the same flawed model discussed below. Moreover, Gass has no personal knowledge of how the TCE contamination occurred at the Macon Site, so any statements contained in this report regarding the source of contamination are disregarded as inadmissible hearsay.

Letter from Cooper to EPA (June 15, 2017) at 7 (Pltf-113 at 7). Cooper then reached out to EPA to discuss the Macon Site. Letter from Cooper to EPA (June 15, 2017) at 7 (Pltf-113 at 7).

On or about June 21, 2017, Cooper approached Spectrum about jointly funding the EE/CA ASAOC, subject to both parties reserving their rights in the current litigation. Memorandum from Lavern Shatteen to Andy Perellis (June 21, 2017) (Pltf-116) (transcribing voicemail message from Mike Ginsberg regarding coordinating EE/CA work). On October 25, 2017, EPA, Cooper, and Spectrum entered into the EE/CA ASAOC, EPA Docket No. CERCLA-07-2016-0014. Stipulation ¶ 60, Doc. 214; EE/CA ASAOC (Pltf-121). Cooper and Spectrum are the "Respondents" under the EE/CA ASAOC. Stipulation ¶ 60, Doc. 214; EE/CA ASAOC ¶ 7 (Pltf-121 at 5). Paragraph 3 of the EE/CA ASAOC states, in relevant part:

> EPA and Respondents recognize that this Settlement Agreement has been negotiated in good faith and that the actions undertaken by Respondents in accordance with this Settlement Agreement do not constitute an admission of any liability. Respondents do not admit, and retain the right to controvert in any current or subsequent proceedings other than proceedings to implement or enforce this Settlement Agreement, the validity of the findings of facts, conclusions of law, and determinations in Sections IV (Findings of Fact) and V (Conclusions of Law and Determinations) of this Settlement Agreement.

Stipulation ¶ 61, Doc. 214 (quoting EE/CA ASAOC ¶ 3 (Pltf-121 at 3)). Cooper and Spectrum are jointly performing and funding the EE/CA ASAOC under an

interim funding agreement with funding to later be reallocated based on further

negotiation or resolution of the pending litigation. Stipulation ¶ 62, Doc. 214;

Former Toastmaster Facility, Macon, Missouri Cooperating Potentially

Responsible Party Agreement §§ 1.1, 4.7 (Pltf-118 at 2, 5). Paragraph 93 of the

EE/CA ASAOC states that it:

> (a) does not alter, impair, waive or bar claims asserted by Respondents'
> against one another in the currently pending lawsuit identified in Paragraph
> 95; and (b) does not alter, impair or bar Respondents from seeking recovery,
> or from bringing any other action or claim, (i) pursuant to the 1980 Asset
> Purchase Agreement entered into by Respondents' predecessors, or (ii)
> preserved, allowed or established by a separate agreement between
> Respondents regarding their participation in this Settlement Agreement.

Stipulation ¶ 63, Doc. 214 (quoting EE/CA ASAOC ¶ 93 (Pltf-121 at 29)). The

private party agreement between Cooper and Spectrum regarding their

participation in the EE/CA ASAOC preserves CERCLA contribution claims

between Cooper and Spectrum. Stipulation ¶ 64, Doc. 214; Former Toastmaster

Facility, Macon, Missouri Cooperating Potentially Responsible Party Agreement §

4.8 (Pltf-118 at 6). As of trial, Cooper and Spectrum had each paid $335,000 into

an escrow account to fund the work required under the EE/CA ASAOC.

Stipulation ¶ 75-76, Doc. 214; Proof of Payment by Cooper to EE/CA Escrow

Account at 1, 7, 17 (Pltf-161 at 1, 7, 17).

<u>TCE Contamination at the Macon Site</u>

The TCE contamination at the Macon Site consists primarily of two general source zones that include the western side of the Site near the former TCE AST and degreasing area and beneath the facility building floor footprint.  Stipulation ¶ 77, Doc. 214; Arcadis, EE/CA Report (Sept. 7, 2018) § 7 (Pltf-141 at 34-35). There is a third potential source zone area located on the eastern portion of the Macon Site.  Stipulation ¶ 78, Doc. 214; Arcadis, EE/CA Report (Sept. 7, 2018) § 7 (Pltf-141 at 34-35).  Consistent with my ruling during trial, Spectrum is solely responsible for the cleanup costs associated with the eastern portion of the Macon Site as the TCE contamination occurred there after Cooper sold the property to Spectrum.

The source area on the western side of the Site near the TCE AST is much larger than any other source area or areas.  Stipulation ¶ 79, Doc. 214; Arcadis, EE/CA Report (Sept. 7, 2018) § 7 (Pltf-141 at 34-35).

The subsurface of the Macon Site is glacial till.  Trial Tr. Vol. 1 at 205:2-10, 206:11-21 (Gass Direct), Doc. 207.  The glacial till "is predominantly clay with some interspersed silt and very fine-grained to coarse-grained sand and gravel lenses within the predominantly clay till."  Arcadis, EE/CA Report (Sept. 7, 2018) § 4.1 (Pltf-141 at 18).[15]

---

[15] The parties stipulated to the introduction of the EE/CA Report, but no one from Arcadis, the engineering firm which prepared the EE/CA, testified as to its preparation or its contents. Therefore, I only consider the portions of the EE/CA which are consistent with other admissible,

Spectrum and Cooper each offered expert testimony on the timing of TCE releases at the Macon Site.[16] These experts used different models to arrive at their conclusions.[17] Spectrum presented the testimony of Tyler E. Gass, a geologist and hydrogeologist, who concluded that TCE releases began no later than the mid-1960s. To arrive at his conclusion, Mr. Gass used the AT123D-AT model, which assumes that the subsurface geology is homogeneous and that flow occurs through the subsurface environment at the same velocity (uniform horizontal velocity). Trial Tr. Vol. 1 at 277:21-278:25 (Gass Cross), Doc. 207. David Reynolds testified for Cooper. Dr. Reynolds holds a Ph.D. in Environmental Engineering and works as an environmental engineer and contaminant hydrogeologist. Dr. Reynolds used the REMChlor-MD model, which was a newly-developed update of an existing model, REMChlor.[18] The REMChlor-MD model takes into account the heterogeneous nature of the Macon Site's soil by addressing different hydraulic

credible evidence. To the extent the EE/CA contains inadmissible hearsay statements, I do not consider those statements as substantive evidence.

[16] This evidence was focused on the western side of the property where the AST was located, as it is the largest area of contamination.

[17] Although the models differ, they both use data obtained from monitoring wells at the Macon Site to determine how groundwater and TCE (referred to as the plume) travel through the subsurface (plume migration). Based on information about the current plume configuration, the models then predict the earliest possible date the TCE could have been released into the ground.

[18] Spectrum criticized this model as a "beta" model because it was still in the final testing stages when Dr. Reynolds performed his analysis, but I do not find this detracts from the model's reliability or usefulness in this case as the testing had to do with the manner in which the data was entered and not the underlying calculations. Trial Tr. Vol. 2 at 152:17-153:23 (Reynolds Direct), Doc. 208. The model had been officially released by the time of trial. Trial Tr. Vol. 2 at 181:5-12 (Reynolds Cross), Doc. 208.

conductivities in transport zones (e.g., sand) versus storage zones (e.g., clay) to determine release dates.  Trial Tr. Vol. 2 at 154:13-156:21 (Reynolds Direct), Doc. 208.  Using this model, Dr. Reynolds concluded that the earliest release resulting in contamination at the Macon Site occurred in 1983.  Trial Tr. Vol. 2 at 155:15-17 (Reynolds Direct), Doc. 208.

I credit Dr. Reynolds' opinion over Mr. Gass' opinion regarding earliest release dates at the Macon Site for several reasons.  I find Dr. Reynolds' model and its use of transport zones more accurately accounts for the glacial till subsurface at the Macon Site than Mr. Gass' assumption of a homogeneous subsurface.  Dr. Reynolds also used more complete and more recent objective data, including the EE/CA data, which Mr. Gass did not consider.[19]  Moreover, Dr. Reynolds' opinion regarding a 1983 release date is consistent with Mr. Waller's testimony that approximately 100 gallons of TCE were released in 1983 from a pinhole leak in the AST.  Mr. Waller's trial testimony was the first time he had given the 1983 date.  Trial Tr. Vol. 2 at 155:15-156:13 (Reynolds Direct), Doc. 208 ("Q. All right.

---

[19] Had Mr. Gass considered this data, the model upon which he relies would have predicted a release date approximately 280 years ago, long before there was any activity at the Macon Site.  Trial Tr. Vol. 2 at 7:18-8:19 (Gass Cross), Doc. 208 ("Q. And so what I'm positing is that we use all the data that you used in your analysis except that we change the hydraulic conductivity to use the 1997 hydraulic conductivity and, therefore, everything is equal except the change in that, and that's an order of magnitude different; right?  A. Yes."); Trial Tr. Vol. 2 at 10:2-12:2 (Gass Cross), Doc. 208 ("[I]sn't it a fact that when we change the porosity to use the EE/CA's calculated porosity as opposed to your six-well calculated porosity, that the release date in your model would be before operations began at the facility?  A. Yes."); Trial Tr. Vol. 2 at 167:14-168:4 (Reynolds Direct), Doc. 208 (discussing how use of the 1997 data in Mr. Gass' model would roughly change the rate of migration from 28 years to 280 years).

So when you put all this into the model, all these numbers and everything, what date did you get?  A. Approximately 1983.  Q. Now, interestingly, yesterday, Mr. Waller testified about a tank release in 1983.  You didn't hear his testimony and confirm your model to that, did you?  A. It's my understanding that no mention of 1983 had occurred by Mr. Waller before yesterday.  Q. So you weren't using any -- you weren't backing into your number using testimony by any witness in the case?  A. No. . . .").[20]

I credit Dr. Reynolds' testimony of an earliest possible release date of 1983 and his testimony that 100 gallons of TCE, with a mass of  about 1,200 pounds, would migrate into the groundwater quickly and could cause contamination significant enough to reflect the current level of contamination at the western side of the Macon Site.  Trial Tr. Vol. 2 at 199:17-200:14; 201:16-202:14 (Reynolds

---

[20] Neither expert witness did a timely calculation of the actual mass of TCE contamination at the Macon Site.  On cross-examination, Dr. Reynolds testified that the 100-gallon spill from the AST pinhole leak could account for the creation of the western plume.  Trial Tr. Vol. 2 at 199:17-25 (Reynolds Cross), Doc. 208.  At his deposition, Mr. Gass stated that he did not know the mass of TCE released at the Macon Site, but during rebuttal at trial he testified for the first time that the western plume could not have been created by the release of 100 gallons of TCE from a pinhole leak in the AST and that instead it would have been closer to a release of 1,200 gallons.  Mr. Gass admittedly made this calculation weeks before trial but did not timely disclose it to Cooper nor did he provide the basis or method of the calculations he used to reach the 1,200 gallon figure.  For that reason, I ruled that it was unfair for me to consider his testimony.  Trial Tr. Vol. 4 at 12:25-13:17, Doc. 210.  Having reviewed the trial record, I am even more firmly convinced that this evidence should not be considered because it was not timely disclosed.  Spectrum relies on this calculation throughout its post-trial brief, even suggesting that I should base my allocation analysis on it.  If this calculation were so crucial to allocation, it should have been disclosed well in advance of trial, not on rebuttal.  Even if it had been properly disclosed, I would still disregard Mr. Gass' opinion as it (like his other opinions) presumes uniform horizontal velocity, which does not accurately account for the subsurface geology at the Macon Site.

Cross), Doc. 208; 205:3-207:9 (Reynolds Redirect), Doc. 208. I also credit Dr.

Reynolds' testimony that a release of a couple gallons of TCE on asphalt would

evaporate quickly and would be less likely to penetrate the groundwater. Trial Tr.

Vol. 2 at 206:1-14 (Reynolds Redirect), Doc. 208.

The EE/CA Report recommends excavation and in-situ thermal remediation

(ISTR)[21] to address the contamination at the Macon Site. (Pltf.-141 at 49). As of

trial, no final remediation plan had been implemented.

Spectrum's Litigation Against CLLC and Compton

On May 3, 2016, Spectrum filed suit against CLLC for indemnity for

environmental liabilities at the Macon Site under the PTA and Environmental

Work and Indemnity Agreement. Stipulation ¶ 65, Doc. 214; Complaint, *Spectrum

v. CLLC*, No. 4:16 CV 627 (E.D. Mo. May 3, 2016)[22] (Pltf-88). On August 21,

2018, the Court granted summary judgment in favor of Spectrum, stating that

CLLC "knowingly assumed all environmental responsibility" for the Macon Site.

Opinion, Memorandum and Order at 12, *Spectrum v. CLLC*, No. 2:16 CV 30 HEA

(E.D. Mo. Aug. 21, 2018) (Pltf-139 at 12); Stipulation ¶ 66, Doc. 214. The Court

directed Spectrum to submit a request for relief, which it did on August 31, 2018,

requesting: (1) a monetary judgment of $3,420,061.49 for past costs; and (2) an

---

[21] ISTR technologies include various methods for applying energy to the subsurface to raise in-situ temperatures within a targeted treatment area. (Pltf.-141 at 41).

[22] The case was inadvertently opened in the Eastern Division as Case Number 4: 16 CV 627, but then was transferred to the Northern Division and assigned Case Number 2: 16 CV 30.

order of specific performance "requiring CLLC to perform future environmental remediation that US EPA will select and require following completion of the EE/CA," including placing $7,500,000 into a court-supervised escrow account, "representing the estimated cost of the environmental remediation that US EPA will select following completion of the EE/CA." Spectrum's Req. for Relief ¶¶ 1, 3.b, 3.c, *Spectrum v. CLLC*, No. 2:16 CV 30 HEA (E.D. Mo. Aug. 31, 2018) (Pltf-140 at 1, 5); Stipulation ¶ 67, Doc. 214. The enumerated "past costs" included environmental costs incurred by Spectrum to "negotiate, perform and coordinate" the 2015 VI ASAOC in the amount of $440,775.80; costs incurred in connection with obtaining the EE/CA (both Spectrum's share after it agreed with Cooper to share the costs in connection with the EE/CA as well as $101,368.66 in costs before Cooper entered into the cost sharing agreement); and "legal fees incurred in negotiating, coordinating and overseeing the performance of the VI ASAOC and the EE/CA ASAOC" in the amount of $556,819.00. *Spectrum v. CLLC*, No. 2:16 CV 30 HEA, Doc. 94 at 4-5. Spectrum sought additional damages as well, including litigation expenses from the instant action. *Spectrum v. CLLC*, No. 2:16 CV 30 HEA, Doc. 94 at 4-5.

Before the Court determined damages, Spectrum settled with CLLC for $1,700,000, but agreed to further limit its recovery to $480,000 provided CLLC complies with the terms of the settlement. Stipulation ¶ 68, Doc. 214; Consent

Decree and Judgment ¶¶ 1-3, *Spectrum v. CLLC*, No. 2:16 CV 30 HEA (E.D. Mo. Sept. 13, 2018) (Pltf-155 at 4-5). Non-monetary obligations to which CLLC agreed as part of the settlement include: moving operations to another location; removal of the building(s); and, placement of an environmental covenant (deed restrictions). Stipulation ¶ 68, Doc. 214; Consent Decree and Judgment ¶¶ 9-12, *Spectrum v. CLLC*, No. 2:16 CV 30 HEA (E.D. Mo. Sept. 13, 2018) (Pltf-155 at 9-12). This agreement was memorialized in a Consent Decree and Judgment entered by the Court on September 13, 2018 (Pltf-155). Stipulation ¶ 68, Doc. 214. As to the non-monetary obligations set forth in the Consent Decree, CLLC executed an environmental covenant to restrict future use of the property. Stipulation ¶ 68, Doc. 214. Performance of the remaining non-monetary obligations under the Consent Decree has yet to occur, as the deadlines set forth in the Consent Decree to perform those obligations have not yet passed. Stipulation ¶ 68, Doc. 214; Consent Decree and Judgment ¶¶ 9-12, *Spectrum v. CLLC*, No. 2:16 CV 30 HEA (E.D. Mo. Sept. 13, 2018) (Pltf-155 at 9-12).

CERCLA Definitions

Spectrum is a "person" as defined by CERCLA Section 101(21), 42 U.S.C. § 9601(21). Stipulation ¶ 70, Doc. 214. Cooper is a "person" as defined by CERCLA Section 101(21), 42 U.S.C. § 9601(21). Stipulation ¶ 71, Doc. 214. The Macon Site is a "facility" as defined by CERCLA Section 101(9), 42 U.S.C.

§ 9601(9). Stipulation ¶ 72, Doc. 214. TCE is a "hazardous substance" within the meaning of CERCLA Section 101(14), 42 U.S.C. § 9601(14). Stipulation ¶ 73, Doc. 214. There have been one or more "releases" or "threatened releases" of "hazardous substances" into the "environment" at the Macon Site within the meanings of CERCLA Sections 101(22), 101(14), 101(8), and 107(a), 42 U.S.C. §§ 9601(22), 9601(14), 9601(8), 9607(a). Stipulation ¶ 74, Doc. 214.

The funds Cooper and Spectrum have paid into an escrow account to fund the work required under the EE/CA ASAOC constitute "response" costs within the meaning of CERCLA Section 101(25), 42 U.S.C. § 9601(25). Stipulation ¶ 75, Doc. 214. These response costs were necessary and consistent with the National Contingency Plan within the meanings of CERCLA Sections 107(a) and 105, 42 U.S.C. §§ 9607(a) and 9605, and 40 C.F.R. Part 300.[23] Stipulation ¶ 75, Doc. 214. Cooper and Spectrum have each paid an additional $5,000 into the escrow account to fund work required under the EE/CA ASAOC. Stipulation ¶ 76, Doc. 214. This additional funding constitutes "response" costs within the meaning of CERCLA Section 101(25), 42 U.S.C. § 9601(25). Stipulation ¶ 76, Doc. 214. These response costs are necessary and consistent with the National Contingency Plan within the meanings of CERCLA Sections 107(a) and 105, 42 U.S.C. §§ 9607(a) and 9605, and 40 C.F.R. Part 300. Stipulation ¶ 76, Doc. 214.

---

[23] The parties have stipulated that these funds may be insufficient to cover all of the work required under the EE/CA ASAOC. Stipulation ¶ 76, Doc. 214.

Necessary environmental costs incurred by ERM, retained by Spectrum to
perform and coordinate the VI ASAOC, are in the amount of $440,775.80 and are
consistent with the National Contingency Plan.  Stipulation ¶ 87, Doc. 214.

Necessary environmental costs incurred by Arcadis, retained by Spectrum to
prepare a work plan, health and safety plan, and sampling and analysis plan for the
EE/CA as part of the process of negotiating the EE/CA ASAOC, are in the amount
of $101,368.66 and are consistent with the National Contingency Plan.  Stipulation
¶ 88, Doc. 214.

## **Conclusions of Law**

Section 113(f)(1) of the Comprehensive Environmental Response,
Compensation and Liability Act ("CERCLA") states:

> Any person may seek contribution from any other person who is liable or
> potentially liable under section 9607(a) of this title, during or following any
> civil action under section 9606 of this title or under section 9607(a) of this
> title.  Such claims shall be brought in accordance with this section and the
> Federal Rules of Civil Procedure, and shall be governed by Federal law.  In
> resolving contribution claims, the court may allocate response costs among
> liable parties using such equitable factors as the court determines
> appropriate.  Nothing in this subsection shall diminish the right of any
> person to bring an action for contribution in the absence of a civil action
> under section 9606 of this title or section 9607 of this title.

42 U.S.C. § 9613(f)(1).  CERCLA Section 107(a) provides in relevant part that:

> Notwithstanding any other provision or rule of law, and subject only to the
> defenses set forth in subsection (b) of this section— . . . (2) any person who
> at the time of disposal of any hazardous substance owned or operated any

facility at which such hazardous substances were disposed of . . . shall be liable for-- . . . any other necessary costs of response incurred by any other person consistent with the national contingency plan . . . .

*Id.* § 9607(a).  CERCLA Section 113(f)(3)(B) states:

A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2).

*Id.* § 9613(f)(3)(B).

As of the effective date of the EE/CA ASAOC, Cooper and Spectrum have resolved their liability to the United States within the meaning of Sections 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(h)(4), for the matters addressed in the EE/CA ASAOC.  EE/CA ASAOC ¶ 93 (Pltf-121).

CERCLA Section 101(29) defines the term "disposal" by reference to Section 1004 of the Solid Waste Disposal Act ("SWDA"), 42 U.S.C. § 6903.  42 U.S.C. § 9601(29).  The SWDA defines "disposal" as:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

*Id.* § 6903(3).  CERCLA Section 101(14) defines "hazardous substance" as:

(A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act [33 U.S.C. § 1321(b)(2)(A)], (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C. § 6921] (but not including any waste the regulation

of which under the Solid Waste Disposal Act [42 U.S.C. § 6901 *et seq.*] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act [33 U.S.C. § 1317(a)], (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act [15 U.S.C. § 2606].  The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

*Id.* § 9601(14).

CERCLA Section 101(20) defines "owner or operator" in relevant part as follows:  "in the case of an onshore facility or an offshore facility, any person owning or operating such facility."  *Id.* § 9601(20)(A)(ii).  CERCLA Section 101(18) defines "onshore facility" as:  "any facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under, any land or nonnavigable waters within the United States."  *Id.* § 9601(18).

CERCLA Section 101(9) defines "facility" as:

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

*Id.* § 9601(9).  CERCLA Section 101(21) defines "person" as:  "an individual,

firm, corporation, association, partnership, consortium, joint venture, commercial

entity, United States Government, State, municipality, commission, political

subdivision of a State, or any interstate body."  *Id.* § 9601(21).

CERCLA Section 101(22) defines "release" in relevant part as:

> "any spilling, leaking, pumping, pouring, emitting, emptying, discharging,
> injecting, escaping, leaching, dumping, or disposing into the environment
> (including the abandonment or discarding of barrels, containers, and other
> closed receptacles containing any hazardous substance or pollutant or
> contaminant) . . . ."  *Id.* § 9601(22).

CERCLA Section 101(8) defines "environment" in relevant part as:  "any other

surface water, ground water, drinking water supply, land surface or subsurface

strata, or ambient air within the United States or under the jurisdiction of the

United States."  *Id.* § 9601(8)(B).  CERCLA Section 101(25) defines "response" as

"remove, removal, remedy, and remedial action;[] all such terms (including the

terms 'removal' and 'remedial action') include enforcement activities related

thereto."  *Id.* § 9601(25).

CERCLA Section 101(23) defines "remove" or "removal" as:

> the cleanup or removal of released hazardous substances from the
> environment, such actions as may be necessary taken in the event of the
> threat of release of hazardous substances into the environment, such actions
> as may be necessary to monitor, assess, and evaluate the release or threat of
> release of hazardous substances, the disposal of removed material, or the
> taking of such other actions as may be necessary to prevent, minimize, or
> mitigate damage to the public health or welfare or to the environment, which
> may otherwise result from a release or threat of release.  The term includes,
> in addition, without being limited to, security fencing or other measures to

limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C. § 5121 *et seq.*].

*Id.* § 9601(23). CERCLA Section 101(24) defines "remedy" or "remedial action" as:

those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

*Id.* § 9601(24).

Spectrum and Cooper are "persons" as defined by CERCLA Section 101(21), 42 U.S.C. § 9601(21). The Macon Site is a "facility" as defined

by CERCLA Section 101(9), 42 U.S.C. § 9601(9). TCE is a "hazardous substance" within the meaning of CERCLA Section 101(14), 42 U.S.C. § 9601(14). There have been one or more "releases" or "threatened releases" of "hazardous substances" into the "environment" at the Macon Site within the meanings of CERCLA Sections 101(22), 101(14), 101(8), and 107(a), 42 U.S.C. §§ 9601(22), 9601(14), 9601(8), 9607(a). Stipulation ¶ 74, Doc. 214. During the period of Spectrum's ownership and/or operation, TCE was "released" into the "environment" as a result of Spectrum's operations at the Macon Site, as those terms are defined by CERCLA Sections 101(22) and 101(8). 42 U.S.C. §§ 9601(8)(B), 9601(22). During the period of Cooper's ownership and/or operation, TCE was also "released" into the "environment" as a result of Spectrum's operations at the Macon Site, as those terms are defined by CERCLA Sections 101(22) and 101(8). 42 U.S.C. §§ 9601(8)(B), 9601(22). Therefore, both Spectrum and Cooper are liable under CERCLA Section 107(a)(2) because each company owned and/or operated the Macon Site "at the time of disposal of any hazardous substance" at the Macon Site. *Id.* § 9607(a)(2).[24]  Because

---

[24] Before trial, Spectrum abandoned its efforts to establish arranger liability under CERCLA, Section 107(a)(3), 42 U.S.C. § 9607(a)(3). Thus, the only class of liability at issue in this case is former owner/operator liability.

Spectrum and Cooper are both liable under CERCLA,[25] they may only maintain § 113(f) contribution claims.

I must now proceed to allocate response costs between Cooper and Spectrum. A common approach to allocation of response costs in CERCLA cases is to allocate a percentage of the costs to each liable party. *See*, *Waste Mgmt. of Almeda County, Inc. v. East Bay Regional Park Dist.*, 135 F. Supp. 2d 1071, 1104-05 (N.D. Cal. 2001). The percentage would apply to past costs incurred by the parties, as well as prospectively to future response costs through the issuance of a declaratory judgment.

"In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). The "Gore Factors" are the most widely used of the various equitable factors courts have considered when performing allocations in resolving contribution claims. *See Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 935 (8th Cir. 1995). The Gore Factors are:

---

[25] As stated above, the parties have stipulated that Spectrum's past costs in the amount of $877,144.46 and Cooper's past costs in the amount of $335,000 are recoverable as response costs which were necessary and consistent with the national contingency plan. The parties have also incurred an additional $16,000 in recoverable costs, resulting in a stipulated uncontested amount of past costs in the amount of $893,114.46 for Spectrum and $351,000 for Cooper. The parties have thus established the four elements necessary to demonstrate that the other is liable under CERCLA. *See Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 934 (8th Cir. 1995). Spectrum additionally seeks an additional $180,158 in disputed past costs. Cooper seeks an additional $111,246.61 in disputed past costs. The disputed fees relate to attorney's fees sought under the United States Supreme Court's decision in *Key Tronic Corp. v. United States*, 511 U.S. 809 (1994).

1. the ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished;

2. the amount of hazardous waste involved;

3. the degree of toxicity of the hazardous waste;

4. the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

5. the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

6. the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

*Id.* (quoting Nagle, CERCLA, Causation, and Responsibility, 78 Minn. L. Rev. 1493, 1522 n.133 (1994)).  These factors "are neither an exhaustive nor exclusive list," and "a court may consider any factors appropriate to balance the equities in the totality of the circumstances." *Environmental Transp. Systems, Inc. v. ENSCO, Inc.*, 969 F.2d 503, 509 (7th Cir. 1992).  "[I]n any given case, a court may consider several factors, a few factors, or only one determining factor . . . depending on the totality of the circumstances presented to the court." *Id.* at 510.[26]

I will focus on the degree of each party's involvement in the contamination as the starting point for allocation.  "Those parties who can show that their contribution to the harm is relatively small in terms of amount of waste, toxicity of

---

[26] Both parties offered expert testimony on allocation.  Cooper offered the testimony of David Ledbetter, Esq.  Spectrum offered an allocation opinion from Mr. Gass.  After careful review of the entire trial record, I do not find either opinion to be useful to the Court so I have not considered them in reaching my decision.

the waste, involvement with the waste, and care, stand in a better position to be allocated a smaller portion of response costs." *Control Data Corp.*, 53 F.3d at 936.

As I previously concluded during trial, Spectrum's allocated share of the response costs associated with the contamination located on the east side of the Macon Site is 100%, as the only evidence offered at trial demonstrated that the east side contamination was solely attributable to Spectrum.[27] There was simply no evidence whatsoever that Cooper was responsible for this contamination.

As for the costs associated with contamination located on the west side of the Macon Site and under the building footprint, the Court concludes that Spectrum is responsible for most of the contamination based upon the pinhole leak in the AST occurring in 1983 which spilled 100 gallons of TCE. In contrast, the only

---

[27] For this reason Spectrum's motion for reconsideration must be denied. I did not, as Spectrum argues, conclude that the harm was divisible under CERCLA § 107 because there were no § 107 claims at issue. The parties only assert § 113 claims against the other. Instead, I determined at the close of Spectrum's case that Spectrum should be allocated 100% of the costs associated with the contamination on the east side of the Macon Site because the only evidence Spectrum offered with respect to that contamination came from Mr. Clark, who witnessed a 55 gallon drum of TCE spilling on the ground on the east side of the parking lot. Mr. Clark testified that this drum leak occurred after 1991, long after Cooper sold the property to Spectrum. It was for this reason that I granted Cooper's motion and continue to believe that Spectrum is solely responsible for those costs. Liability under § 113 is only several, not joint and several. *Sun Co., Inc. (R & M) v. Browning-Ferris, Inc.*, 124 F.3d 1187, 1191 (10th Cir. 1997). Spectrum never offered evidence during its case in chief that the east side contamination is migrating from the building footprint, and so I do not consider this argument now on reconsideration.

Nor do I find the evidence belatedly offered by Spectrum (the EE/CA report) in its motion for reconsideration to persuasively support that point, either. The EE/CA report acknowledges that the east side contamination is different than that of the building footprint, and the underlying data shows a significantly higher TCE concentration on the east side than that of the building footprint, undermining Spectrum's theory that the building footprint contamination was the "source" of the east side contamination. When the concentration data is combined with the groundwater flow assumptions, it suggests that the plumes under the building and the east side are not interconnected. For these reasons, Spectrum's motion for reconsideration will be denied.

admissible evidence of a spill occurring during Cooper's ownership of the property was one spill of 2-3 gallons of TCE during the filling of the AST.  Neither Spectrum nor Cooper focused on causes of contamination at the Macon Site beyond the AST on the west side of the property, even though there is also contamination underlying the building footprint.  Both Cooper and Spectrum used TCE in similar ways during the manufacturing process.[28]  Spectrum erroneously argues in its post-trial brief that Mr. Halterman testified about drips or spills from the batch degreaser. Doc. 218 at 6.  Mr. Halterman actually testified that he could not recall any drips or spills of TCE and that parts were fully dried before being removed from the degreasing machines.  Doc. 196-1 at 105:21-106:11, , Doc. 196-1 at 109:9-110:13.  No witness testified to observing TCE drips or spills on the manufacturing floor.  Therefore, while Spectrum argues that the contamination under the building was likely caused by drips or spills of TCE during the manufacturing process (and then proceeds to point the finger at Cooper as the source of these drips and spills), there is no actual evidence that this ever occurred at the Macon Site.  Instead, the only admissible evidence of TCE releases that could have caused the contamination on the west side of the Macon Site (including

---

[28] Production volume was greater during Spectrum's period of operations, but the use of vanishing oil probably decreased the amount of TCE used by Spectrum in the later period of operations.  Neither party presented persuasive evidence that the handling or use of TCE varied substantially during Cooper or Spectrum's period of operations, other than workers stopped washing their hands with TCE, probably sometime in the 1980s, and that TCE was stored in drums after the AST leak was discovered.  There is simply no credible evidence in the record for me to conclude that one party should be allocated more responsibility for response costs than the other based on how TCE was handled during the manufacturing process.

the building footprint) comes from Mr. Waller, who testified to a 100-gallon leak of TCE in 1983, and a single 2 or 3 gallon spill of TCE in 1977-78. Mr. Waller's testimony is also consistent with Dr. Reynolds' testimony, who testified that the earliest release resulting in contamination on the west side of the Macon Site occurred in 1983 and that a 2-3 gallon spill would most likely evaporate quickly. Spectrum asks me to assume, without evidence, that drivers routinely spilled 2-3 gallons of TCE on the ground over many years. This is unreasonable and unwarranted speculation. As previously discussed, I credit Dr. Reynolds' testimony over Mr. Gass' testimony.[29] As Spectrum owned and operated the Macon Site in 1983 when most of the TCE contamination occurred, I allocate response costs for the western side of the property and under the building footprint as follows: 5% to Cooper and 95% to Spectrum.

I also conclude that this percentage should be adjusted to reflect Spectrum's extraordinary delay in notifying Cooper of the contamination and in engaging in meaningful remediation efforts once the contamination was discovered. The lengthy passage of time between Spectrum's discovery of the TCE contamination in 1991 and its ultimate notification to Cooper in 2015[30] unduly prejudiced Cooper's ability to investigate the source of contamination and participate in

---

[29]To the extent these findings are also conclusions of law, they are incorporated herein and will not be restated.

[30] Cooper was first notified by the EPA, not Spectrum, in 2014.

potential remediation efforts.[31]  The only "investigation" done into the source of the contamination was conducted by Mr. Clark, years after the pinhole leak in the AST was discovered in 1983.[32]  As discussed above, Mr. Clark's conclusions were not based on his personal observations of TCE handling practices at the Macon Site, nor were they even based on conversations with anyone who handled TCE at the Macon Site.  Instead, Mr. Clark relied upon statements made by workers from other plants to formulate his speculative conclusions, which he then presented to the MDNR as uncontested factual background information regarding the contamination at the Macon Site, when it actually was not.[33]  Had Spectrum timely notified Cooper of the contamination, Cooper could have conducted its own investigation into the potential source of the contamination, perhaps discovering witnesses with personal knowledge of the TCE handling practices or searching its own records for relevant information.  By the time Cooper was notified, witnesses were either not available or had only a dim recollection of events, and relevant records were no longer in existence.

---

[31] Spectrum actually knew of the TCE leak in 1983 when it occurred but did nothing to investigate whether that leak resulted in contamination until 1991.

[32] Even after the contamination was discovered by Mr. Clark in 1991, Spectrum waited until 1992 to report it to the National Response Center.  Mr. Clark could provide no explanation for the delay.

[33] As discussed above, I do not consider any statements in these documents, whether generated for or by the MDNR or subsequent regulatory authorities, as relevant, admissible evidence regarding the source of TCE contamination, because they all rely on the inadmissible opinions of Mr. Clark as the source of the information.

Nor was this delay attributable to a lack of information on Spectrum's part at the time it discovered the contamination. Spectrum knew that Cooper was the prior owner of the Macon Site in 1991 because it purchased the property from Cooper in 1980. There were no intervening owners or operators of the Macon Site, and no evidence has been offered as to any prior owners or operators before Cooper. Spectrum's inordinate delay ensured that only its narrative of the contamination at the Macon Site was presented to the regulatory authorities and deprived Cooper of any meaningful opportunity to corroborate or contest Spectrum's version of events.

While I do not agree with Cooper that this delay can be translated into a precise dollar amount,[34] there is no question that Spectrum's failure to provide prompt notification regarding the contamination made it virtually impossible for Cooper to conduct a timely investigation into the contamination at the Macon Site. Moreover, while I also do not credit Cooper's evidence regarding the viability and expense of certain available remedies in 1991 compared to appropriate remedies available now,[35] MDNR repeatedly requested Spectrum prepare a remedial action plan for the Macon Site as part of its participation in the VCP, and Spectrum never

---

[34] I therefore reject Cooper's proposed allocation which includes a setoff amount of $8.2 million to account for the delay.

[35] Cooper offered the testimony of a costing expert, Michael Berman, P.E., to support these arguments. I do not credit Mr. Berman's opinion that the current cost of implementing in-situ bioremediation at the Macon Site in 2018 is 8.2 million dollars more than it would have been in 1998, as it was largely speculative and his calculations did not properly account for inflation. Therefore, I am not granting Cooper's request for a setoff to reflect this $8.2 million.

did so.  During Spectrum's participation in the VCP, contamination at the Macon

Site spread.  Instead of remediating, Spectrum eventually sold the Macon Site to

CLLC, an entity unable or unwilling to fulfill its obligations with respect to the

cleanup.  CLLC's failures eventually led to the termination of the Macon Site in

the VCP and the EPA's subsequent involvement.  The Court therefore allocates an

additional one percent to Spectrum to reflect its extraordinary delay in notifying

Cooper about the contamination and its refusal to meaningfully participate in

remediation efforts once enrolled in the VCP.  This results in the following

allocation of costs associated with contamination located on the west side of the

Macon Site and under the building footprint:  4% to Cooper and 96% to Spectrum.

This allocation applies to past and future response costs.

CERCLA § 114(b) states that "[a]ny person who receives compensation for

removal costs or damages or claims pursuant to any other Federal or State law

shall be precluded from receiving compensation for the same removal costs or

damages or claims as provided in this chapter."  42 U.S.C. § 9614(b).  The Eighth

Circuit Court of Appeals has held that private party settlements are relevant to the

allocation determination and should be considered to avoid double recovery by one

party.  *K.C. 1986 Ltd. Partnership v. Reade Mfg.*, 472 F.3d 1009, 1017-18 (8th Cir.

2007).  Neither CERCLA nor the Eighth Circuit specify how to account for private

party settlements in the CERCLA contribution context.  Courts faced with this

issue generally apply either the dollar-for-dollar approach embodied in the Uniform Contribution Among Tortfeasor's Act, which reduces the liability of the non-settling party by the amount of the settlement, or the proportionate share approach embodied in the Uniform Comparative Fault Act, which reduces the liability of the non-settling party by the equitable share of the settling party's obligations. *See AmeriPride Services Inc. v. Texas Eastern Overseas Inc.*, 782 F.3d 474, 483-88 (9th Cir. 2015). According to the Tenth Circuit Court of Appeals, "the majority of courts deciding contribution suits between private parties . . . have applied the Uniform Comparative Fault Act to reduce a nonsettling party's liability by the amount of the settling party's liability, not the settlement amount." *Tosco Corp. v. Koch Industries, Inc.*, 216 F.3d 886, 897 (10th Cir. 2000). "Although courts have discretion to choose a method to allocate liability to nonsettling defendants in private-party contribution actions under CERCLA, they must exercise this discretion in a manner consistent with § 9613(f)(1) and the purposes of CERCLA. Choosing a method that would discourage settlement or produce plainly inequitable results could constitute an abuse of discretion." *AmeriPride*, 782 F.3d at 488.

The parties disagree about whether Spectrum's prior settlement with CLLC must be accounted for as part of the allocation analysis. Spectrum settled its claims against CLLC for $1.7 million and agreed to further limit its recovery to

$480,000, provided CLLC complies with the terms of the settlement. Cooper contends that the Court should take into account the fact that Spectrum ultimately settled its lawsuit with CLLC for much less than the amount initially sought. Cooper argues that the allocation should reflect the higher amount of the settlement. In contrast, Spectrum argues that its settlement with CLLC can be disregarded in the allocation analysis because it resolved contractual damages "wholly unrelated" to the response costs at issue in this case.[36]

Spectrum's argument that it sought damages from CLLC which were "wholly unrelated" to the response costs at issue in this case is rejected. Spectrum is seeking from Cooper the same $440,775.80 to "negotiate, perform and coordinate" the 2015 VI ASAOC that it claimed as damages in the prior litigation with CLLC, as well as the same $101,368.66 in costs incurred in connection with obtaining the EE/CA prior to Cooper entering into the cost sharing agreement. These costs were articulated as damages by Spectrum in the prior litigation, *see Spectrum v. CLLC*, No. 2:16 CV 30 HEA, Doc. 94 at 4-5, and in closing argument by Spectrum in this case. *See* Deft.-A-209-013. That Spectrum sought additional

[36] Spectrum also suggests that this Court should allocate liability to CLLC as the current owner of the Macon Site and consider its performance of certain obligations under the terms of the settlement to constitute their share, with any eventual inability to perform those obligations allocated equally between Cooper and Spectrum. This argument was not raised earlier, and neither side presented any evidence as to the amount of liability, if any, that should be allocated to CLLC. CLLC is not a party to this allocation proceeding, and there has been no evidence that they should be allocated "orphan shares." Given that CLLC is a known party which currently owns the Macon Site and is performing environmental obligations as required under the Consent Decree and Judgment entered in *Spectrum v. CLLC*, No. 2:16 CV 30 HEA, the Court declines to allocate any percentage of liability to CLLC in this proceeding.

damages from CLLC does not alter this fact.  Spectrum's argument that I should simply ignore the prior settlement because the additional damages claimed in the prior litigation exceed the settlement amount is unavailing.  Spectrum ultimately agreed to compromise all claims against CLLC, and nothing in the settlement or Consent Decree and Judgment indicates otherwise.  Spectrum's prior settlement must be accounted for in this allocation analysis, and I conclude that Cooper is entitled to a set-off in the amount of $480,000.00, which represents the compromised settlement amount in the Consent Decree and Judgment entered in *Spectrum v. CLLC*, No. 2:16 CV 30 HEA, Doc. 94.  While less than the $1,700,000 initially agreed to in settlement, I conclude that a credit in the compromised amount of $480,000.00 is appropriate because the Consent Decree and Judgment imposes additional non-monetary obligations on CLLC with respect to the Macon Site, which also benefits Cooper to the extent it decreases overall future response costs at the Macon Site.

Both parties also seek attorney's fees under the United States Supreme Court's decision in *Key Tronic Corp. v. United States*, 511 U.S. 809 (1994). Spectrum seeks $180,158 in attorneys' fees and Cooper seeks $111,246.  *Key Tronic* rejected the argument that a prevailing party can recover attorneys' fees under CERLCA, holding instead that recoverable cleanup costs may only include legal fees that are "closely tied to the actual cleanup."  511 U.S. at 820.  "[T]hese

efforts might well be performed by engineers, chemists, private investigators, or other professionals who are not lawyers." *Id.* at 820. Legal work related to tracking down other responsible parties may potentially be recoverable, but legal services performed in connection with negotiating with regulatory authorities are not. *Id.* at 819-21. "Studies that [] counsel prepared or supervised during those negotiations," even if they aided EPA and the cleanup effort, are not recoverable response costs because the primary purpose is to protect the client's "interests as a defendant in the proceedings that established the extent of its liability." *Id.* at 820.

Having reviewed the invoices submitted by both parties, I cannot conclude that either party's claimed legal fees are recoverable under the standards set out in *Key Tronic*. There is simply no indication from the vaguely-worded invoices submitted by both parties that the services provided by any of the lawyers were of the type that might "well be performed by engineers, chemists, private investigators, or other professionals." *See Key Tronic*, 511 U.S. at 820. Instead, the invoices generically describe negotiating with regulatory authorities and/or each other in attempts to limit and/or absolve their respective client's liability, services which appear distinctly legal in nature and are specifically exempt from recovery under *Key Tronic*.[37] There are no time entries submitted by either party

---

[37] I agree with Cooper that Spectrum cannot claim legal fees or expert reports incurred in connection with identifying Cooper as a potentially responsible party to EPA because Spectrum already knew Cooper was the prior owner of the Macon Site, and Gass' expert report was primarily created for the purpose of protecting Spectrum's interests. I also agree with Spectrum

which clearly describe work covered by *Key Tronic*. As there is no way for the Court to specifically identify from the invoices whether these generally described services are recoverable or not, I conclude that neither party has met its burden of demonstrating entitlement to attorneys' fees in this case.

Finally, the Court's interpretation of the 1980 APA and the corresponding rights and obligations of the parties, as set out in the opinion issued November 16, 2018, Doc. 158, should be incorporated into the proposed Judgment to be filed with the Court as set out below.

## Conclusion

The Court allocates the following percentages of liability for past and future response costs for the west side and under the building footprint at the Macon Site as follows: 4% to Cooper and 96% to Spectrum. Cooper is entitled to a setoff in the amount of $480,000.00 to reflect Spectrum's settlement with CLLC. Spectrum is liable for 100% of the response costs on the east side of the Macon Site.

Cooper must file a proposed Judgment in accordance with this Memorandum and Order for the Court's consideration within fourteen (14) days which shall specify all amounts owed and relief to be awarded, including prejudgment interest where appropriate,[38] and shall incorporate the Court's prior

---

that Cooper is not entitled to its fees incurred for negotiating its liability with regulatory authorities.

[38] "An award of prejudgment interest – whether in a joint and several liability action under § 107 or a contribution action under § 1113 of CERCLA – is mandatory." *Reade Mfg.*, 472 F.3d at 1018 (internal quotation marks and citation omitted).

summary judgment ruling. Spectrum may file an opposition to Cooper's proposed Judgment fourteen (14) days thereafter if it disputes any mathematical calculation or the form of the proposed Judgment, and it may submit an alternative proposed Judgment if it so chooses. The proposed Judgment(s) should not contain any substantive objections to the underlying decision, and submission of (or agreement with) a proposed form of Judgment does not constitute a waiver of any substantive legal argument, but any disputes with respect to calculations of amounts owed or the wording of any part of the proposed form of relief must be raised in accordance with this Memorandum and Order.

Accordingly,

**IT IS HEREBY ORDERED** that Cooper must submit a proposed Judgment in accordance with this Memorandum and Order within fourteen (14) days of the date of this Memorandum and Order, and Spectrum may file any opposition or an alternative proposed Judgment in accordance with this Memorandum and Order fourteen (14) days thereafter.

**IT IS FURTHER ORDERED** that the motion for reconsideration [202] is denied.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 12th day of September, 2019.